## RUSSELL *vs.* THE MAYOR, &c. OF THE CITY OF NEW-YORK

The corporation of the city of New-York is not liable in an action at common law brought to recover compensation for the loss of personal property deposited in a building which was destroyed by virtue of an order of the mayor and two aldermen pursuant to the statute (2 *R. L.* 368, § 81) to prevent the spreading of a conflagration.

The remedy of the owners of property destroyed pursuant to such an order against the corporation, is limited to an assessment according to the statute, and does not therefore extend to the loss of property belonging to persons having no interest in the buildings destroyed, such persons not being entitled to an assessment.

The authority conferred by the statute on the mayor, &c. to order the destruction of buildings to prevent the spreading of a fire is not a grant of the right of *eminent domain,* and is not therefore within the constitutional provision requiring compensation to the owner of private property taken for public use. *Per* SHERMAN and PORTER, *Senators.*

The statute conferring that authority is a *regulation* of the right which individuals possess to destroy private property in cases of inevitable necessity, to prevent the spreading of fire or other great calamity. *Per* SHERMAN, *Senator.*

The mayor and aldermen, in making an order for the destruction of a building pur suant to the statute, do not act as the officers or agents of the corporation, but as magistrates designated by the legislature for the execution of a public duty. *Per* SHERMAN and PORTER, *Senators.*

ON error from the supreme court. Russell sued the corporation of the city of New-York in the superior court of that city in *assumpsit,* for the value of a quantity of merchandize which was destroyed in the great fire in December, 1835. The goods were deposited in a store in Exchange place, which was blown up and destroyed by order of the mayor and two aldermen, in order to prevent the fire from extending in that direction. The first count of the declaration stated that by an act of the legislature which was passed April 9th, 1813, *upon the application and at the request of the defendants,* the mayor or recorder with the consent of any two aldermen, or three aldermen, were authorized to order any building which should be on fire, or which they might deem hazardous and likely to take fire or to convey the fire to other buildings, to be pulled down or destroyed. (2 *R. L.* 1813,

*p.* 368, § 81.) (*a*)   That on, &c. certain, to wit, fifty buildings situate in the first ward of the said city were on fire, and were burning so rapidly that all the buildings in the city would have been destroyed but for the destruction of the building in which the plaintiff's goods were deposited; that the mayor and two aldermen deeming that building, which was not yet on fire, hazardous and likely to take fire and to communicate it to other buildings, did pursuant to the act aforesaid order it to be destroyed, and that it was accordingly blown up and destroyed by the servants and agents of the defendants for that purpose appointed, for the preservation of all the other buildings and personal property in the city and for the common benefit of all the inhabitants thereof.   The plaintiff further averred that he

(*a*) The sections relating to this subject are as follows:

§ 81. And be it further enacted, that when any building or buildings in the city of New-York shall be on fire, it shall be lawful for the mayor, or in his absence the recorder of the city, with the consent and concurrence of any two of the aldermen thereof, or for any three of the aldermen, to direct and order the same, or any other building which they may deem hazardous, and likely to take fire, or to convey the fire to other buildings, to be pulled down or destroyed; and upon the application of any person interested in such building so pulled down or destroyed, to the mayor or recorder or any two aldermen, it shall be their duty to issue a precept for a jury to inquire of and assess the damages which the owners of such building, and all persons having any estate or interest therein have respectively sustained by the pulling down or destroying thereof; which precept shall be issued, directed, executed, returned and proceeded upon, and the proceedings thereon shall take effect, as nearly as may be, in such manner as by the two hundred and nineteenth section of this act are directed, in relation to ground taken for the purposes therein mentioned; and the said inquiry and assessment having been confirmed by the mayor's court, the sums assessed by the said jury shall be paid by the said mayor, aldermen and commonalty, to the respective persons in whose favor the jury shall have assessed the same, in full satisfaction of all demands of such persons respectively by reason of the pulling down or destroying of such building; and the mayor's court, before whom any such process shall be returnable, shall have power to compel the attendance of jurors and witnesses upon any such assessment of damages.

§ 83. And be it further enacted, that the sum assessed by such jury as aforesaid, for any building so pulled down or destroyed as aforesaid (the same assessment and inquiry having been confirmed by the court) shall, together with the expenses of the proceedings for such assessment, be borne and defrayed by the said mayor, aldermen and commonalty.

Russell v. The Mayor, &c. of New-York.

had no estate or interest in the building, but that he was lawfully possessed of merchandize lawfully stored and deposited therein of great value, to wit, of the value of ten thousand dollars, which was destroyed by the blowing up of the building and wholly lost to the plaintiff, of which the defendants had notice; whereby the defendants became liable " to cause just compensation to be made unto the said plaintiff for the loss and destruction of his said goods;" in consideration whereof the defendants promised the plaintiff that they " should and would by all such due and lawful ways and means as the laws and customs of the state of New-York allow and approve, cause just compensation for such loss and destruction as aforesaid, to be made to the said plaintiff when they the said defendants should be thereunto afterwards requested." Breach, that the defendants although requested, &c. and although a reasonable time had elapsed, had not caused compensation to be made or taken any measures for that purpose. In respect to the fifteen other counts of which the declaration was composed it is sufficient to state that they were substantially like the first, except that certain of them omitted the averment that the statute referred to was passed on the application of the defendants, and that others did not refer to the statute at all; some omitted the statement that the destruction of the building was by the agents and servants of the defendants, while another set stated the obligation and the promise of the defendants to be to make just compensation for the goods, or to pay what they were reasonably worth. The counts also varied in the statement of the necessity of destroying the building, a portion of them, like the one above mentioned, stating it absolutely, and the others averring only that the mayor, &c. or the defendants *deemed* the store to be hazardous and likely to take fire and to convey the said fire to other buildings. The defendants demurred generally to the declaration, and the plaintiff joined in demurrer.

The superior court gave judgment for the defendants, upon which the plaintiff sued out a writ of error to the supreme court, where the judgment of the superior court was affirmed. The plaintiff thereupon brought error to this court. The justices of

the supreme court in giving judgment referred to a decision of that court at a former term in the cause of *Lawrence and others against the same defendants,* in which the same questions arose, for their reasons for the judgment of affirmance in this case. The opinion in the former case was delivered in the following terms by

BRONSON, J. This action is founded upon the allegation that the property of the plaintiffs has been taken for public use by the defendants; and it is then said, that the plaintiffs may have an action, by virtue of the seventh section of the seventh article of the constitution, which provides that private property shall not be taken for public use without just compensation.

Without going much at large into the question, I am of opinion that the case does not come within this clause of the constitution. If the property was "taken" by any body, within the meaning of the clause, it was not taken by the corporation of the city of New-York, nor for their use. It was taken by the mayor and two aldermen who ordered the destruction of the building in which the goods were contained, or by the persons who executed their mandate. And the property was not taken "for public use," but it was destroyed to prevent the spreading of a conflagration, and thus saving the property of other persons in the immediate neighborhood. It was taken for private use. Nine-tenths of the city had little or no interest in the question, and the corporation, as such, had none at all.

I agree with Mr. Justice Oakley, in his opinion in the superior court, that "the benefit arising from the act was local and individual, and cannot be considered as public, without doing violence to language, in its ordinary meaning. Still less can it be considered a benefit to the defendants. The corporation, as a body politic, possesses property, and also certain corporate rights and powers, in which all the citizens have a common interest. But it does not in any sense represent the individual and private property of the citizen; and a measure intended to protect or save such private and individual property, cannot be said to confer a benefit upon the city as a body corporate."

I have said that the property was not taken by the defendants. And here again, I cannot better express my own views than by quoting the language of Mr. Justice Oakley. "The law under which the mayor and two aldermen acted, does not make them the agents of the corporation; for it is clear that it invests them with power to act in the premises according to their own discretion, and against even the expressed prohibition of the defendants. If, on the occasion of the fire alluded to, the defendants had in the most formal manner passed an ordinance prohibiting the mayor from acting under the law, it would nevertheless have been competent for him to have exercised the power granted to him. This consideration alone is sufficient to show, that the mayor and aldermen, in the case in question, were not the agents of the defendants. In truth I consider the act as intended to create an agency, independent of the corporation, for the purpose of preventing the extension of fires. The corporation, as such, is not connected with it any more than it would have been if the law had designated three members of the chamber of commerce to perform the duties assigned to the mayor and the two aldermen. The corporation is not responsible for their acts any further than the law has made them so." This covers the whole ground.

It is true that the statute has, to some extent, charged the damages of those whose property may be destroyed, upon the corporation. With what justice this was done, I will not stop to inquire. It is sufficient to say that the statute gives a right, where none would have existed without it, and points out the remedy; and where that is done, the statute remedy can alone be pursued. If the case of the plaintiff has not been provided for by the statute, it is either his misfortune, or he must take such remedy as may be found in the common law; and that will not charge the defendants with the consequences of an act which they neither did, nor authorized to be done. If the plaintiff had brought trespass against the mayor and two aldermen, or against the persons who executed their order, very different questions would have arisen. But I need say nothing upon those questions.

*Charles O'Conor,* for the plaintiff in error.

*D. Graham, Jr.* for the defendants in error.

SHERMAN, Senator. The plaintiff assumes that the statute in question is to be interpreted as a grant to the defendants of a power existing in the state, by virtue of the right of *eminent domain,* to take private property for the use of the city, to be executed by certain officers designated in the act as agents and representatives of the defendants. He maintains that it is a restricted power, the exercise of which is prohibited by the principles of natural justice, by the rules of the common law, and by the constitution, unless accompanied by a provision for making just compensation; and that for the value of his property destroyed by these officers in pursuance of the act, the corporation is responsible in assumpsit. The right of taking private property for public use by the legislature or by its grantees, and that of the owner to a just compensation therefor, are no doubt concurrent: the right to compensation is incident to the exercise of the power to take. This doctrine is indisputable, and indeed was not attempted to be controverted upon the argument.

If the plaintiff's notions as to the origin of this power are correct, a position which I am by no means willing to adopt without modification, his right to recover in this suit would still be surrounded by difficulties, inasmuch as the statutory remedy against the defendants has been exhausted. The condition expressed in the grant, to be performed by the defendants, has been fulfilled by them to the letter. The part of the compact, the performance of which devolved upon them, is in no respect alleged to have been violated, either in the undue or improper exercise of the power delegated, or in any other respect whatever.

As extraordinary as it may appear, it is nevertheless strictly true, that this case presents the novelty of an action brought against the defendants, to compel them to respond in damages for an act of the mayor and two aldermen, which the plaintiffs allege they were by statute not only authorized to do, but for the

omission to do which, under the circumstances stated, they would have rendered themselves amenable to our courts for a criminal neglect of their duty as public officers. It is not an action against the defendants for the misfeasance or nonfeasance of their officers; it is not predicated upon any liability imposed by the terms of the act, but it is brought upon the ground that the statute which compelled these officers to blow up this building, recognizes a right at law to compensation to the owners of the goods destroyed; while it is admitted that the remedy by assessment affords an indemnity only to "the owner of the building destroyed," and to "persons having an estate or interest therein." By a very liberal construction this has been held by this court to embrace compensation for personal property belonging to such persons, or upon which they have a lien for advances.

The plaintiff having alleged the destruction to have been in pursuance of the statute, he is as I conceive limited to the remedy given by the statute.

There is an old and well established maxim of the common law, that a natural right arising from any cause whatever, which is possessed by any person, is subjected to a restricted exercise, so as not thereby to cause any injury to another. I can see no objection to the application of this rule to rights of the nature conferred in this case; and if thus applied, it might sanction a special action on the case in favor of the plaintiff against the persons upon whom this right was conferred, for so carelessly and negligently exercising that right, as to produce the injury complained of to the plaintiff's goods. Here, however, the plaintiff proceeds upon the ground that the legislature was bound not only to provide in the act a remedy for the destruction produced, but to furnish against the defendants that remedy not only for the damages which were direct, but for those that were consequential; and that not having done so in terms, the plaintiff has a right to sustain this action against them, upon the principle that it is virtually thus enacted.

In a clear case of a grant of the right of *eminent domain* to a corporation, to be exercised for its corporate use, containing no

provision whatever for compensation to the owner, I am not disposed to doubt but that the law would step in and supply the defect, and furnish a suitable remedy to the persons whose property was authorized to be appropriated; and perhaps against a party benefitted. It however by no means follows, that in such a grant, containing a clause imposing heavy and onerous burdens upon the grantee, there can be engrafted upon the conveyance a further obligation to make compensation for a subject matter not referred to in the terms of the grant, though it should be apparent that such omission was merely inadvertent.

The argument of the plaintiff's counsel was, that the state being bound to provide compensation in all cases, when it authorizes the taking of private property for public use, the grantee of the state takes such authority subject to the duty of providing compensation. In the first number of the American Law Magazine, recently published in Philadelphia, ( *Vol.* 1, *p.* 52 & *seq.*,) the nature and extent of this obligation to provide compensation, where the act itself is silent on the subject, is ably discussed; and, it seems to me, it will be found difficult to escape from the conclusion to which the author arrives. It is as follows: "The obligation to make indemnity for the exercise of a sovereign right, attaches to the sovereign power. So far as that duty has not been delegated, it remains in the state. For all the privileges invested by the grant of the franchise, the duties required are the full consideration. Those duties, therefore, cannot be varied, without violation of the contract." "We cannot then look beyond the charter itself, to determine the duties and liabilities of the grantee. If the legislature has not required that indemnity shall be made for all consequential damage in the charter itself, it is because that duty is reserved to the state. If it had been delegated to the grantee, it would have been the consideration of more extended privileges, or greater pecuniary advantage.; and it would be a gross violation of contract, if the state should require its grantee to assume the duties of the government, and to make compensation for damages not contemplated in the terms of the grant." ( *p.* 75.) In aid of this very cogent reasoning, it may, without impropri-

Russell *v.* The Mayor, &c. of New-York.

ety, be assumed that this court has indirectly approved of this view in the case of *Stone* v. *The Mayor, &c. of New-York,* (25 *Wend.* 157,) where Senator Verplanck remarks, that "If compensation for losses sustained by reason of the exercise of this right of eminent domain, over private property, is not provided for under some previous general law, then legislative relief, by special act, is a claim of strict right, not an appeal to the bounty or discretion of the state." (*p.* 175.) And to the same effect Chancellor Walworth, in his unpublished dissenting opinion in the same case, observes: "As the constitution has declared that private property shall not be taken for public use, without just compensation, if the property of individuals, which would otherwise have been saved, was actually sacrificed, during the great fire, to save the city from impending peril, and the present statute is not broad enough to reach such cases, the legislature at this time has the power to direct the proper compensation to be made, to be assessed upon the whole city, or upon that portion of it which the legislature may, in its wisdom, think should contribute to make good the loss." In like manner, Chief Justice Nelson, in *Lyon* v. *Jerome,* (15 *Wend.* 574,) in speaking of a supposed inadequate provision for indemnity to a party whose property was taken by virtue of the power of *eminent domain,* remarks, that "The good faith of the state is pledged to [the plaintiff,] and if there is any defect in the prescribed mode in such cases, an appeal to the sovereign power, the legislature of the state, we are bound to presume, cannot fail to afford him redress."

Although it may be said that these authorities maintain the right in the legislature, by subsequent enactments, to impose still further liabilities upon the grantees of the power of the state, (a point which is not now under consideration, nor necessary to be determined;) yet it is apparent that they proceed upon the assumption that the state is the party to whom the injured person is to look for relief, and upon whom the acknowledged obligation rests to provide an adequate remedy. It certainly could be a matter of no concern to the plaintiff whether the means were taken from the state treasury, or obtained by the imposi-

tion of the burthen upon some party whom the legislature might adjudge to be the party benefitted. In either event, in essence and in matter of fact, the compensation would be derived from the state.

By referring to the provision of the constitution relied on, it will be found that instead of conflicting, it will materially aid in supporting the ground taken that this obligation belongs to the state. The language of the 7th section of the 7th article is, "nor shall private property be taken for public use, without just compensation." It is not said by whom it is to be paid. The right to a just compensation may well be insisted upon against the principal, *i. e.* the state, not only where it appropriates the property of the citizen to the use of the public, for its own benefit and by means of its own officers, but likewise where it empowers a corporation, an artificial person of its own creation, as its agent to exercise that sovereign right which alone appertains to the state itself. But it is contended that the delegation of this power by the principal to an agent necessarily, and by implication of law, imposes (even against the intention of the legislature) this obligation upon the agent. The language of the constitution does not, I apprehend, warrant such a construction. The principle, which is familiar to every one, that an agent acting within the scope of his authority is excused from personal responsibility, and binds only his principal, is at war with this strained construction of the constitution. In the absence of any express provision, I maintain the reverse of the proposition, and hold that the principal and not the agent is responsible.

In maintaining the position that I have taken, I have not designed to hold, that the owner of private property may not lawfully resist the appropriation of it to the public use, unless an adequate and certain compensation has been provided; or that he is in any case bound to trust the government to make provision for such compensation by future legislation, excepting in cases of actual necessity which will not admit of any delay. The case of the *Charles River Bridge* v. *The Warren Bridge*, (7 *Pick.* 344,) is relied upon by the plaintifl's counsel to sustain the doctrine, that a jurisdiction is

recognized in that case as existing in the court irrespective of the remedy provided by the act. Such a principle does not, in my judgment, in any manner come in collision with the views I have advanced. That case simply decides that where the legislature attempts to provide a compensation to the persons whose property is appropriated to the public use, it has not the right or the power to limit the compensation to a specified sum. By such a provision, the legislature would undertake to do what a jury of the country only could constitutionally do—assess the amount of the compensation. Mr. Justice McLean, in the same case, when it came before the supreme court of the United States, observed: "Here then is a law which not only takes away the property, but provides to some extent for their [the owners'] indemnity. Whether the complainants have availed themselves of this provision does not appear, nor is it very material: the law in this respect does not bind them, and they are entitled to an adequate compensation for the property." (11 *Peters*, 571.) The reasoning of Mr. Justice Story in the same case is, it is urged, favorable to the plaintiff. But I apprehend that the able opinion given by that eminent jurist was not designed as an authority for disregarding the statutory remedy, provided it had been *adequate* and unattended with the usurpation of the right in the legislature to fix and assess the damages. The state can appropriate to its use the private property of the citizen, in virtue of the right of *eminent domain ;* but it may not rightfully assume to make the grantee of the power the judge of the amount of compensation ; in other words, compel a sale, and arbitrarily fix its own price. Should the state do so, and that price should be wholly inadequate, *in that respect* it would be clearly in conflict with the provision of the constitution guaranteeing a just compensation, and consequently not binding or obligatory upon the citizen. "If a statute says that a man shall be a judge in his own cause, such a law, being contrary to natural equity, shall be void." Such was the intrepid opinion of Lord Chief Justice Hobart in *Day* v. *Savage,* (*Hob.* 85.) In the case of *Chadwick* v. *Proprietors of Haverhill Bridge,* (2 *Dane's Abr.* 686, *ch.* 67,) the principle decided is the same: that the legislature could not deprive the plaintiff

of his constitutional right to have his damages assessed in a civil action.

In *Bloodgood* v. *Mohawk and Hudson R. R. Co.*, in this court, (18 *Wend. R.* 18,) the Chancellor holds, that "the compensation must be either ascertained and paid in advance before his [the owner's] property is thus appropriated, or an appropriate remedy must be provided upon an adequate fund, whereby he may obtain such compensation through the medium of the courts of justice, if those whose duty it is to make such compensation refuse to do so." The same doctrine is recognized in the case of *Bonaparte* v. *Camden and Amboy R. R. Co.*, (1 *Baldwin*, 205.) In *Fletcher* v. *Peck*, (6 *Cranch*, 145,) Johnson, J. gives this very correct definition of right in question. "The effect of the right of eminent domain against an individual, amounts to nothing more than a power to oblige him to sell and convey, when the public necessities require it."

After a careful examination of the foregoing cases, as well as all the others which have been cited, I have been unable to find an authority to sustain the plaintiff's action against these defendants. The remedy provided by the statute having been exhausted without reaching this case, and there being no provision in the grant of the power in question making it the duty of the grantee to provide a compensation for such an injury as this, if my construction of the constitutional provision is correct, the duty of furnishing a compensation for the plaintiff's property does not rest on the defendants.

It was held by Judge Oakley, in delivering the opinion of the superior court, (and that opinion on this point is adopted by the supreme court,) that this power or grant was not given to the corporation of the city of New-York, but was conferred upon the mayor and aldermen, &c. as state officers, who were by their official names designated to perform this duty. If, however, I regarded this grant as an exercise of the right of *eminent domain*, I should feel compelled, upon the authority of the case of *The People* v. *Purdy*, decided by this court, (4 *Hill*, 384,) to hold that the grant was in fact to the corporation of the city of New-York. In that case the question was necessarily involved,

whether a right conferred upon the aldermen belonged to the corporation, and was a corporate right; and a majority of the court held the affirmative. Senator Scott remarks: "The powers conferred on the aldermen are grants of power to the corporation, and, in this point of view, it is immaterial what belongs to the office of alderman as such. It is enough that he is one of the corporate officers. An abridgment of his power will abridge that of the corporation, because the latter cannot exercise its corporate functions, but by and through its officers." In the case of *Tucker* v. *The Trustees of Rochester*, (7 *Wendell*, 254,) where a similar question arose, it was held by Nelson, C. J. that "The treasurer [of the village] is the elected agent of the corporation, whose powers and duties are specifically defined in its charter, and when acting within the scope and limit of them, his acts are as binding upon that body as those of the trustees or any other legally constituted agent." (*See also The Bank of Columbia* v. *Patterson's adm'r*, 7 *Cranch*, 299; *Danforth* v. *Sch. and Du. Turnp. Road*, 12 *John.* 227; *Dunn* v. *Rector of St. Andrew's Church*, 14 *id.* 118; *Mott* v. *Hicks*, 1 *Cowen*, 513; *Bright* v. *Supervisors of Chenango*, 18 *John.* 242; *Doubleday* v. *Supervisors of Broome*, 2 *Cowen*, 533.)

But if the view taken by the courts below in this respect is correct, the argument for the defendants is much strengthened. Conceding for the present that the grant was in virtue of the right of *eminent domain*, you cannot for a moment maintain the justice of compelling the corporation of the city of New-York to pay even for the buildings blown up, provided the act was intended simply as a delegation of its power to its own agents for the convenience and advantage of the state, and not as a grant to the corporation.

But I apprehend that the assumption of the plaintiff, that this was a case of the exercise of the right of *eminent domain*, will prove a fallacy. I have arrived at this conclusion after a patient examination of all the authorities, and after adverting to the usual indicia that distinguish such a grant from the powers that are frequently granted to municipal corporations. The destruction of this property was authorized by the law of overruling necessity; it was the exercise of a natural right belong-

ing to every individual, not conferred by law, but tacitly excepted from all human codes. The best elementary writers lay down the principle, and adjudications upon adjudications have for centuries sustained, sanctioned and upheld it, that in a case of actual necessity, to prevent the spreading of a fire, the ravages of a pestilence, or any other great public calamity, the private property of any individual may be lawfully destroyed for the relief, protection or safety of the many, without subjecting the actors to personal responsibility for the damages which the owner has sustained. (*See* 2 *Kent's Com. 4th ed.* 338; 15 *Vin. tit. Necessity, pl.* 8; *Maleverer* v. *Spink,* 1 *Dyer,* 36, *b.;* 17 *Wendell,* 297; 18 *id.* 129; 20 *id.* 144; 25 *id.* 162, 163, 174; *Respublica* v. *Sparhawk,* 1 *Dallas,* 357.) The latter case goes very fully into the discussion of the nature and extent of the natural right arising from pressing and inevitable necessity; and the great fire which occurred in London in 1666 is referred to, when the Lord Mayor of London refused to destroy about forty wooden houses, and also certain tenements occupied by *lawyers,* in consequence of which the fire spread and threatened the destruction of the whole city.

Starting, as I do, with the indisputable right which existed to destroy the building in question, without reference to any statute, but subjecting, as it is conceded, the actors to the inconvenience of justifying themselves by evidence of the actual existence of such necessity, I can still conceive an abundant motive for the act in question. The power was conferred upon discreet and prudent individuals, possessing in their official situation strong evidence of the confidence of their fellow citizens. It was suitable that the power should be thus vested in order to prevent on the one hand the ruinous and overwhelming calamity, that might be consequent upon the refusal of any person, amid the consternations caused by the rapid spread of the destructive conflagration, to assume the responsibility of interposing, by the exercise of this right, and on the other to prevent its exercise by the reckless and irresponsible, who might, in a panic, in the absence of any such designation of persons upon whom the duty should be devolved, uselessly destroy millions of property belonging to its

Russell *v.* The Mayor, &c. of New-York.

citizens. To prevent the occurrence of either of these misfortunes, it was wisely determined to *regulate* so important a matter as this. The corporate authorities, if they suggested the law, proceeded with wise forecast. They caused it to be provided, that the city treasury should stand charged with the payment of the loss occasioned to the owner of the building destroyed, even were it so situated that it would the next hour have been consumed by the conflagration. It was a penalty imposed to prevent the wanton and reckless exercise of the authority given by the legislature.

And it is worthy of remark that the plaintiff does not aver that his property would have been saved from the fire if the building had not been blown up. For any thing that appears it would inevitably have been burned whether the building was torn down or not. I maintain that as a matter of state police, the right is unqualifiedly vested in the legislature, in order to protect its citizens from any impending calamity arising from conflagration, pestilential diseases, or any other threatened and blighting evil, by special enactment, to regulate and control its citizens, as to the circumstances, mode and manner in which they shall be permitted to resort to this law of overruling necessity. The assumed necessity supersedes all laws of general application, made for the preservation of life, liberty and property, and subjects these vast interests to destruction by any irresponsible person who may take upon himself the exercise of the power in question. By the common law, it is left to be exercised at the peril, and upon the personal accountability of him who shall resort to it, promising him no other reliance or dependence for immunity, than the verdict of his peers, to be founded upon clear and satisfactory evidence of the overwhelming nature of the approaching calamity, for the staying of which this hazardous and perilous right was by him exercised.

The wisdom of the legislature, in making provisions to subject the mariner and his vessel to the quarantine laws, without providing any compensation for the loss and delay, and for the confinement of the crew and passengers to the prescribed limits, has never been questioned; and yet these regulations are the

exercise of a power similar to that now brought in question. During the *cholera* season, the legislature, in the exercise of the same important power, extended a very similar police regulation, to be exercised by the boards of health, created by the law, over the whole state. It authorized the agents employed, in their discretion, arbitrarily to destroy an unlimited amount of the property of its citizens, for the purpose of preventing the spread of the disease, without imposing any obligation or subjecting them to any responsibility whatever. (*Stat.* 1832, *p.* 581.)

Was not the power granted to the corporation of the city of New-York, to be exercised by its mayor and two aldermen, to stay the raging element, when viewed as a police regulation, another most salutary, provident and truly commendable exercise of the same authority? Foreseeing that the voluntary and unofficial exercise of the power in question could not be relied on upon occasions little favorable to calmness and deliberation, and that immensely important interests were exposed both to the hazards arising from inaction and from reckless exertions, the legislature could not hesitate to interpose, and by special enactment to vest a regulated discretion somewhere. And where more judiciously, than in those officers who were already charged with responsible public duties? And what would be more likely to secure caution and prudence than the liability to which they would subject their constituents, to pay for the buildings destroyed?

The defendants have already, in my judgment, been most unjustly mulcted in heavy damages, to compensate for the destruction of large amounts of personal property, which, to me, it is perfectly evident the legislature never designed to provide any remedy for, against the city. On a careful perusal of Mr. Justice Bronson's dissenting opinion, in the case involving the construction of this statute, it cannot fail to commend itself to every unprejudiced mind. Regarding this law as a police regulation, and not an exercise of the sovereign right of *eminent domain*, it will be apparent, I think, that the decisions of this court, extending this statutory remedy not only to the personal property of the owners of the buildings deposited therein, but

also to their commissions on goods belonging to others and consigned to them, have gone, to say the least, to the utmost limit which any fair interpretation of the statute would author- ize, in favor of the sufferers by the exercise of the power in question. It was the building, and that only, that the city was compelled, by the natural construction of the law, to pay for ; and it was for the damages that should be sustained to the building, and not such as might be done to the personal property of the persons occupying or interested in the building, that the corporate authorities could tax the citizens. I allude to this topic here, because one important and serious ground of complaint made by the plaintiff in this case is, that this court has so ex- tended the provisions of the act as to embrace every other description of loss but the class in which the plaintiff is found. And for this reason, it is gravely urged that this court should look with favor upon this effort to obtain redress.

I am in favor of affirming the judgment of the supreme court.

PORTER, Senator. In 1806 the legislature passed an act, enti- tled " An act for the better government of the city of New-York," &c., and among many other provisions it enacted, " That when any building or buildings in the city of New-York shall be on fire, it shall be lawful for the mayor, or in his absence the re- corder of the city, with the consent and concurrence of any two of the aldermen thereof, or for any three of the aldermen, to direct and order the same, or any other building which they may deem hazardous and likely to take fire or to convey the fire to other buildings, to be pulled down or destroyed." (5. *Webs.* 516, § 8.) It further provided, that *all persons interested in any such building* might have their damages assessed in the manner provided in the act; and the corporation was directed to pay these damages. (§ 10.)

In the case of *The Mayor, &c.* v. *Lord*, (17 *Wendell*, 285,) which was a case arising under this statute, it was decided by the supreme court that the corporation was liable to pay, after the assessment provided for by the statute, the damages sustained by the destruction of merchandise and other personal effects

which were in the building at the time of its destruction, and were the property of the occupant, on the ground that he had such an interest in the building as was embraced in the act; and the reasoning of the court went to show, that no person but such as had an interest or estate in the building was entitled to relief under the act. This decision was affirmed in this court. (18 *Wend.* 129.)

In *The Mayor, &c.* v. *Stone,* (20 *Wend.* 139,) another sui brought under this act, it was further held, that no one but the owner or person having an estate or interest in the building destroyed was entitled to claim damages under the act; and that the owner or lessee, who had goods on hand as a factor or commission merchant, and had a lien upon the same for charges or advances, might claim damages to the amount of his lien, but not for the value of the goods. And also, that one having goods stored in a building destroyed, of which he was not a tenant or occupant, was not entitled to compensation under the act. The judgment last mentioned was also affirmed in this court. (25 *Wend.* 157.)

It thus appears that it has been expressly decided, that the plaintiff has no claim under this act. He seeks therefore, in this suit, to charge the defendants with the payment of his damages, on the ground that the defendants have accepted a grant of power from the state, being a grant of the *eminent domain,* and have, in the exercise of that power, through their agents the mayor and two aldermen, taken the plaintiff's property for the public use, without any provision having been made by the statute for their payment. Hence he maintains that the act being done for the benefit of the defendants, and at their instance, the law raises the promise by them to pay the damages. Prior to the passing of this act, and now, in all cases not affected by it, the rule of the common law is resorted to. By that rule, whenever it was necessary in order to prevent the spreading of a fire, any one might tear down or destroy a building, without subjecting himself to an action by the owner.

In the case of *The Mayor, &c.* v. *Lord,* just referred to, Chief Justice Nelson says: " No doubt, at common law, any person, in

case of actual necessity, to prevent the spreading of a fire, might prostrate a building, in a block or street, without being responsible, in trespass or otherwise. No legal redress existed for the injury, though the sufferer might have been thereby ruined. This was so resolved, among other things, in the *Saltpetre case*, by all the justices, in the reign of James 1st. (12 *Co.* 12.) ' For the commonwealth a man shall suffer damage; as for saving a city or town, a house shall be plucked down, if the next be on fire; and a thing for the commonwealth every man may do without being liable to an action.' (*See also Dyer*, 36; 15 *Vin. tit. Necessity, pl.* 8; *Bac. Elem.* 27, 28, *and* 2 *Kent's Com.* 333.")

Such being the common law, and it belonging to every individual to exercise the right or to abstain from it at discretion, it was doubtless found by experience, that in a large city, where fires were frequent and large ones not unfrequent, and where the means of extinguishing them were continually improving and more or less doubts hanging over the question of absolute necessity, individuals were unwilling to run the hazard, in any case, of ordering the destruction of a building to prevent the spreading of a fire. They might be subjected to annoying lawsuits, however pressing the necessity, and justifiable the act, and in every instance they would have cast upon them the burden of proving a case of overruling necessity; and if they failed in this respect, it would involve them in loss, and perhaps in ruin. And as each case must depend upon the opinions of witnesses and as opinions are liable to vary, an instance of any one volunteering to order a building to be torn down or blown up must have been exceedingly rare, if it ever happened.

It was probably from such considerations that the defendants, in their solicitude for the welfare of the city, made the application for the passage of the law in question. They asked that certain officers might be authorized to exercise their judgment, in a proper case, and direct the destruction of buildings in order to prevent the spread of a fire, and that the city should be required to pay the damages. This act was *pro tanto* an alteration of the common law. It substituted the judgment of the officers designated, in the

place of actual necessity; and as an equivalent for the great public benefit which might, and probably would grow out of the provision, it required the defendants to pay the damages specified in the act. The declaration states that it was under the authority thus given, that the store in question was blown up by the direction of the mayor and two aldermen, and that the goods of the plaintiff in the store were destroyed.

The plaintiff contends that the defendants, by petitioning for the passage of the law and accepting it, have adopted it as a grant of a portion of the sovereign power of the state to the corporation of the city, and that any acts done under it by the officers named in the law are done in behalf of the defendants, and at their instance. They insist that the defendants are as plainly responsible for the act of the mayor and aldermen in this respect, as though they had been executing a city ordinance. They further claim that private property has been taken for public use, and that the constitution secures to the owners, in all cases, a just compensation; and as it was, in this instance, taken by the order of the defendants, that they are liable, upon the principles of the common law to pay the damages.

The defendants on the contrary insist that there is no grant of power to the corporation in this respect, by the provision in question, but that by the very terms of the act and according to its true spirit and meaning, the delegation of authority was made to the officers therein named, and to them only; that consequently those officers were not the agents of the corporation, and could not subject the defendants to the payment of any other damages than those specified in the statute. They also maintain that if they are made in any manner responsible for the acts of the mayor and two aldermen, as their agents, that the destruction of this property, under the circumstances, was not the taking of private property for public use, within the meaning of the constitution; that there is a manifest distinction between that taking of private property which is occasionally done by virtue of the right of *eminent domain*, for an use in which the public have an interest, and the destruction of a building and the property contained in it to prevent the spreading of a fire.

I have not heard an argument which proves that this grant has been conferred upon the defendants. It is not pretended that it is contained in the language of the act, nor that by any interpretation of the act itself, independent of all other circumstances, these officers are made the agents of the corporation. It confers no private benefit upon the corporation. The advantage it may be to the city at large, does not benefit the corporation, as such, except in respect to the property it owns, and in that respect it stands upon the same footing as individual citizens.

It cannot, I think, be denied that it was competent for the legislature to confer this authority upon officers of its own designation, who should be entirely distinct from, and independent of the corporation. Suppose it had authorized the judges of the court of common pleas, or any three members of the chamber of commerce, as suggested by Judge Oakley in the opinion given in the superior court, to perform this duty, could it then have been pretended, that in ordering this act to be done, they were the agents of the defendants? The statute (1 *R. S.* 430, § 29), authorizes the health officer, if he shall judge it necessary to prevent infection or contagion, to cause any bedding or clothing on board a vessel subject to quarantine, or any portion of her cargo that he may deem infected, to be destroyed. In doing this act, is he the agent of the corporation? And yet the service that he renders, and the act that he does, is strikingly similar in character to that done by the mayor and aldermen in this case. I think he acts in obedience to the command, and under the authority of a public statute, and also that the mayor and aldermen were so acting, at the time they gave the direction to destroy this store.

It is insisted that certain extrinsic circumstances go to show that this grant of power must have been intended for the common council; one of which is, that they petitioned for it. It seems to me not to be a necessary consequence of the act of petitioning, or even fairly inferrible from it that the grant was designed to be conferred upon them. Suppose the statute, instead of naming the officers, had defined their powers and duties, and

authorized the governor to appoint them—the substance of the petition would have been granted, but with a single variation as to the mode of designating the persons to exercise the power. I do not see why the officer would not have been as much an agent of the corporation in the one case as in the other; and yet it would hardly have been pretended that the governor's nominee could commit the corporation beyond the terms of the statute.

The case having the nearest analogy to the one under consideration of any that I find, is that of *Bailey* v. *The Mayor, &c. of New-York*, (3 *Hill*, 531.) (*a*)    On the petition of the common council, the legislature passed the act authorizing the construction of the Croton aqueduct, and named the commissioners in the law. A question arose in that case, as to the liability of the corporation for the acts of the commissioners, and they were adjudged to be liable.    The reason was that the corporation had an interest in the grant made by the law : it held a large amount of property under it, had passed ordinances in respect to the execution of the work and the doings of the commissioners, and in every respect had made the work their own, and consequently had made the commissioners their agents.    I see no force in the argument drawn from the fact that the common council petitioned for this law.    It was simply requesting that a specified power should be conferred upon certain distinct functionaries, to be used for the public benefit, and proposing on their part that the city should pay certain damages arising out of the execution of that power.    For this they could safely petition, without being deemed the grantees of the power, or without its furnishing any evidence to prove them such.

It is argued that the title of the act, which is " An act for the better government of the city of New-York, *and to grant certain additional powers and rights to the mayor, aldermen and commonalty thereof*, and to explain, continue and amend the respective acts therein mentioned;" shows that this grant of power was made to the corporation.    When it is recollected that this act contains a great number of sections, and embraces

---

(*a*) Affirmed on error to this court, (*ante, p.* 433.)

Russell v. The Mayor, &c. of New-York.

many provisions relating to the government of the city, I cannot think that such an inference, without any countenance from the language of the section containing this grant, is of any force. If the plaintiff could show that there was no grant of power to the corporation in any other section, there would be more foundation for the inference. But this he will not pretend. There is no doubt of the propriety of referring to the title of an act for the purpose of explaining its terms, when they are not clear; but I think it will be difficult to find authority for such reference for the purpose of showing that the power conferred thereby was intended to be conferred, not upon the party to whom the power was in terms granted, but upon some other person or authority.

I have therefore come to the conclusion, that the act of the mayor and two aldermen in blowing up the store in question, was not the act of the defendants, nor one for which they are responsible, but that it was done by officers created by the law of the state, who are not amenable to the common council for their acts in the premises.

But as other members of the court may, perhaps, take a different view of points already discussed, I will proceed to consider the other principal branch of this case, namely, whether the provision of the constitution which declares "that private property shall not be taken for public use, without just compensation," is applicable to the case. This property was destroyed to prevent the further ravages of the fire. I have referred to another act which authorizes the destruction of personal property, to prevent the spread of any pestilential or contagious disease. Is this the taking of private property for public use? The plaintiff's counsel have argued, that as the taking of individual property for *private* use is entirely indefensible, and the case for the defendants could not be put upon that ground, therefore it necessarily resulted that the taking in this case was for public use. I apprehend that the constitutional limitation was not designed for, and should not be extended to any such case; but that the clause has reference only to cases where the property of an individual is taken for some public benefit or ad-

vantage. A vessel may, in a time of war, be taken from the owner when the interest of the public demands it; or it may be destroyed to prevent its falling into the hands of an enemy, and thereby increase its power of aggression or resistance; and the owner would be entitled upon this principle of the constitution to be paid a just compensation. Many other cases might be put, but these are sufficient for the purposes of illustration. In these cases, and others depending upon the same principle, private property is taken for public use. The right of *eminent domain*—that right which subjects the property of every one to the paramount claim of the public when the common interest or advantage will be promoted thereby—is here asserted.

But I think I perceive a palpable distinction between the principle of those cases and that which should be applied to the one before the court. It seems to be conceded that, by the common law, private property may be destroyed in cases of actual necessity, as of fire and pestilence, without subjecting the individuals destroying it, or the public, to the payment of any compensation. The counsel for the plaintiff insists that this property was taken for public use, on account of the common benefit or advantage derived from its destruction, and that the constitution forbids its being thus taken without compensation. If the constitution is made to embrace this and the like cases, what becomes of the common law rule? It is clear that an overruling necessity would furnish a defence. But can an act in violation of a constitutional right be defended? That instrument declares that private property shall not be taken without just compensation; while the common law rule protects any individual who has destroyed it in a case of necessity and to arrest a greater impending calamity. It has not been suggested, in the argument on this point, that the constitution has abrogated that rule; nor do I perceive how the rule can be impugned. It is founded upon principles which are above or beyond the reach of constitutional restriction, the principle of preservation of life and property in cases of eminent hazard, by the sacrifice of that which is less valuable, and which, from the very exigency of the case, must be left to the decision and de-

termination of the moment. I do not hesitate to say, that any construction of a constitutional provision, that shall sustain its power to such an extent, cannot be sound. I therefore perceive no alternative but that we must come to the conclusion that the destruction of property, in cases of dire necessity, of which those of fire and pestilence are very prominent, is not a taking of private property for public use, within the meaning of the constitution.

If this could be deemed a *taking* for any use within the meaning of the constitution, I do not feel the force of the argument that is urged to show that it was not for public use. It was for some use, either public or private; and if not for public use, then it must have been for private use. If for private use, can any one tell for whose use, or for the use of what street, or neighborhood, or ward, in that city? Can the territorial line be drawn, within which any one can say the use was limited? Suppose a fire was raging in a small compact village, and it was apparent that the whole village must be consumed unless some buildings should be destroyed; could it be said such a taking was not for public use? If it could, then I do not see how any taking can be for public use, unless the *whole* public can be in some way benefitted by such taking. The preservation of the life of a citizen is a matter of public interest, and the taking away of another life, under some circumstances, and the destruction of private property, probably under any circumstances, would be justifiable when the saving of life is in question, in a case of absolute necessity. The taking in each case may, with propriety, be said to be for public use. So the public have a deep interest in arresting the devastation of a fire or plague, or any other great calamity; and although the immediate sufferers are in the first instance a few individuals, yet the means to be employed for arresting the evil are for the public use.

The plaintiff is not entitled to any benefit from the statute except such as it in terms gives. The property was destroyed in obedience to the direction of the act, and that having provided for certain compensation, we must presume that the legislature did not intend that any other should be recovered. If the

mayor and aldermen had been sued for giving the order, they might perhaps have defended themselves on the ground of an overruling necessity. If they could have proved such an exigency to have existed, or that the property would otherwise have been destroyed by the fire, the common law would have protected them. Can that defence be taken away, by the choice of this mode of bringing their action? Read this statute in connection with the principles which, before its date, were applicable to the destruction of private property in cases of fire, and I think its import and extent is this :—The officers named are authorized to destroy any building in the city that is on fire, *or which they deem likely* to take fire, or to convey fire to other buildings. But for the privilege of this power—of exercising this discretion—the city is required to pay certain specified damages. In respect to all other damages the sufferer is referred to his common law rights.

What may be equitable between the plaintiff and the city, or whether the statute stops short in making just and proper provision for compensation for all the property destroyed, are questions not presented by the case, and which should not, I conceive, influence our judgment. I do not think the declaration shews any cause of action, and am of opinion that the judgment of the supreme court should be affirmed.

HARD, Senator. The act of destroying the building, by which the plaintiff lost his goods, was in the exercise of the right of *eminent domain,* and not by virtue of the law of overruling necessity, as contended for by the defendants in error. The distinction between these two rights, as laid down in the English books, is confused and somewhat contradictory, and not consonant with our notion of the rights of private property.

The first case on the subject was the celebrated *saltpetre case.* The government asserted the arbitrary right to provide munitions of war from private property under the pretext of an overruling necessity; and all the justices sustained it. (12 *Co.* 12.) *Mouse's case* was one of *jettison,* where, in a perilous storm at sea, the master of a barge threw overboard a part of the valua-.

ole cargo to save the lives of the passengers and crew. (*Id.* 63.) This too was denominated a case of overruling necessity, and very justly, as it bore all the characteristic marks of that class of cases, while the other bore none of them. But in neither of these cases was the true distinction taken. In the first case the saltpetre was taken by public authority for the general public good; while in the other the property was destroyed by private authority and for individual benefit. The contradictory character of the cases reported in the English books may be the result of the arbitrary constitution of their government. Under a well regulated popular government, the rights of private property are liberally interpreted and cases of overruling necessity strictly defined, from a regard to the just rights of the citizen, while under the reign of a tyrant the rights of the crown are regarded with greater indulgence, and cases of necessity more frequently occur from motives of interest on the part of the government. Such no doubt were the circumstances which gave rise to the confusion in the English law upon this subject. The arbitrary exercise of this right by that government in derogation of the rights of the citizens, whereby private property was frequently taken without consent and without compensation, drew out from the patriots of the revolution our declaration of rights. The burthen of their complaints was, that the rights of private property were trampled upon by public authority, that officers were sent among us " to harass our people and eat out their substance," and that soldiers were quartered among us without our consent. Hence originated that popular struggle. It is a historical fact, that free institutions have generally originated in some arbitrary invasion of private rights on the part of the government which preceded their establishment. *Magna carta* was extorted from a tyrant; and the independence of America was the result of imperial oppression exercised in hostility to private rights. The abuse of the admitted rights which inevitable necessity confers, and the habit of confounding these rights with the doctrines of prerogative, disregarding the just distinction between them, probably led to the provision in our constitution forbidding private property from being taken for the public use without just compensation.

This provision places the distinction upon its true merits: it guards the citizen from the oppressive exercise of the right of *eminent domain* under the pretence of overruling necessity, while it leaves that right where the rules of the common law found it—an instrument of self defence or self protection, or in case of imminent danger—the right of an individual to take or destroy the property of another of less value to save his own of greater value. It does not afford a justification, but furnishes an excuse for a violation of law, arising out of an overruling necessity, in order to protect life or property. The right of *eminent domain,* in the constitution, is subject to two limitations. It must be exercised for the public use; and compensation must be made to the party injured. Here then is found in the organic law of the state—the law of laws—a positive provision, unlimited in its extent, or limited only by the objects of its contemplation, that compensation shall be made for private property taken for public use. If the property in question was taken in the exercise of this right, it clearly establishes the right to recover.

This right of *eminent domain,* residing in the state, may under the limits of the constitution be conferred upon or delegated to a private or municipal corporation; and if accepted, the obligation to make compensation attaches to the grantee. This is a point, I believe, not controverted on the argument. But the formal objection is, that by the act of 1806, (4 *Web. p.* 516, § 8,) subsequently embodied in the laws of 1813, the state did not intend to grant the right of *eminent domain* in this particular, nor did the corporation intend to accept such grant. To answer this objection the plaintiff refers to the title of the act as evidence of the intentions both of the grantor and grantee—the state and the corporation. There is no doubt but that this kind of evidence may be introduced where the intentions of the legislature as to the general object and application of the statute is sought for; as in this case.

The title of the statute is, " An act for the better government of the city of New-York, and to *grant certain additional powers and rights to the mayor, aldermen and commonalty*

*thereof.*" The act contains twenty sections, in every one of which there are provisions for the city of New-York; and the preamble shows that the sole motive of the act is, the "great extension and increase in the trade and inhabitants of the city;" and most of the sections commence by enacting that "It shall and may be lawful for the *mayor, aldermen and commonalty,*" clearly showing that the grant was to them in their corporate capacity.

The *eighth* section, under which the mayor and two aldermen justify the destruction of the property; it is true, provides that it shall be lawful for the mayor and *two* aldermen, or the recorder and *two* aldermen, or in case of their absence *three* aldermen, to remove any building, &c. But this circumstance cannot indicate the intention of the legislature, to distinguish this section from the other parts of the act, and to take it out of the general object and design of the law. It is in *pari materia* with the other sections of the act in regard to its general objects, and must refer to the same preamble and title.

The exigencies for which the legislature were providing were of such a character as in most cases to require prompt action, and hence the convenience and safety of the city necessarily required that these extraordinary powers should be lodged in the hands of a few persons, and that those persons should be men of efficiency and fidelity. But the circumstance that they should be designated in the act, affords no evidence that they are constituted the official agents of the state, and not of the corporation, as is contended by the defendants. If this construction be admitted, it might with equal propriety be contended that in the case of moneyed corporations where the legislature grants a charter and authorizes the appointment of a particular officer, as that of director, and designates a special duty to be performed by him, he acts as the agent of the state in executing the office, and that the state must be held responsible for neglect or official misfeasance, although the act itself is at the instance and for the benefit of the corporation. True the act in question grants the power to remove or destroy buildings, &c. at the discretion of the mayor and *two* aldermen, but in the

same section, as it is found in the original law passed in 1806 they are directed to cause the damages to be assessed; and after the assessment is confirmed by the mayor's court, the damages are to be collected and paid by the *mayor, aldermen and commonalty.*

The corporation, by this express condition, were made answerable for the damages occasioned by the acts of those officers, and it is absurd to pretend that the intention of the parties was to make the corporation responsible for the consequences of the office or agency, unless it had the power to control it. It is clear to my mind, that the real intention of the parties was,—the corporation to ask for,—and the state to grant, an additional corporate power, namely, the right of *eminent domain*, subject to constitutional limitation; and that by accepting the grant, the corporation became legally liable to pay for the property destroyed in the execution of the power or trust committed to it.

There is one other fact alluded to in *Kent's Notes* on the Montgomery charter of New-York, (*Kent's City Charter, p.* 19,) which seems to strengthen this view of the case. By the 11th section of that charter, Governor Dongan granted, for the better government of the city and the welfare of the citizens, to the mayor, aldermen and commonalty, and to their successors, that the mayor, recorder and aldermen, or the mayor and *three* aldermen, might have full authority, under the seal of the corporation, to make free citizens, &c. Here was a power granted to the corporation, to be held and exercised by three of its officers, precisely like the provision of the act under review, with the exception that the duties to be performed were dissimilar, and that the phraseology of the grant was different from that adopted by the simplicity of modern legislation. The duties to be performed were prescribed in the charter, and the agents to perform them were designated by the grantor; still it was granted for the benefit of the corporation, and adopted by it as a part of its charter; and no pretence, I apprehend, will be made that they were the agents of the state.

If I am right in the view I have presented, then the right of *eminent domain*, with discretion to exercise it, was granted to the mayor and two aldermen, as agents for the corporation and

Russell *v.* The Mayor, &c. of New-York.

for its benefit, and the corporation accepted the grant, subject to the constitutional limitation; and when the building was destroyed the corporation became liable to pay a just compensation for the property destroyed in consequence of blowing up the building. I am therefore of opinion that the judgment of the supreme court should be reversed.

Senator LAWRENCE also delivered an opinion in favor of reversing the judgment of the supreme court.

On the question being put, "Shall this judgment be reversed?" the members of the court voted as follows:

*For affirmance:* Senators BOCKEE, CLARK, CORNING, DENNISTON, LOTT, MITCHELL, PORTER, PUTNAM, SCOTT, SHERMAN, VARIAN and VARNEY—12.

*For reversal:* Senators BURNHAM, HARD, LAWRENCE, RHOADES and WORKS—5.

Judgment affirmed.(*a*)

(*a*) This case was decided in December, 1844. At the same term and immediately before the vote above mentioned was taken, the case of Lawrence and others against the same defendants, which involved the same and some other questions of less importance, came on for decision, when it appeared that there were only sixteen members of the court present who had heard the argument, nine of whom voted for affirmance and seven for reversal; but the cause was necessarily left undecided. The opinions of Senators *Sherman, Porter* and *Hard,* substantially as above reported, were delivered in that cause, and were again referred to as the reasons for the votes of those senators in this cause. Owing to the great importance of the question and the amount in controversy, the court in the summer of 1845, permitted the cause of *Lawrence and others* v. *The Mayor, &c.* to be again argued, and at this term (Dec. 1845) the judgment of the supreme court rendered pursuant to the opinion of *Mr. Justice Bronson,* reported ante, p. 464, was affirmed, the *President,* the *Chancellor* and sixteen senators voting for affirmance, and four senators for reversal. The Chancellor delivered a written opinion, in which he held the decision of the court in the case of *Russell* v. *The Mayor, &c.* above reported, to be conclusive upon the principal question, and which he declared to be in accordance with his own judgment.