CORNELIUS D. HICKS, Respondent, *v.* ROBERT C. DORN, Superintendent of Canal Repairs, Appellant.

(GENERAL TERM, THIRD DISTRICT, MAY, 1869.)

In the use of means to restore a canal to a navigable condition after it has been determined that there is an obstruction requiring removal, a superintendent of canal repairs acts ministerially, and is liable for damages if he unnecessarily adopts such a remedy, or proceeds in such a manner as to injure private property.

To justify the injury or destruction of private property, there must exist a pressing public necessity both as to the act to be done and the manner of doing it; and whether such a necessity existed is a question of fact to be determined from the circumstances of the case.

Accordingly, where plaintiff's boat had grounded (without his fault), between the gates of a dry dock, opening into a basin of the canal, and thus prevented navigation; and the superintendent, acting in good faith, and doing no more injury than the act required, destroyed the boat; and it appeared that other methods were practicable, and might have been adopted by him, without serious detriment to the public interests, which did not necessarily involve injury to the plaintiff's boat—*Held*, the superintendent was liable for the value of the boat.

THIS was an appeal by defendant, from a judgment rendered in favor of plaintiff, on the report of a referee, for $2,131.95. On the 19th of May, 1865, the defendant was superintendent

of canal repairs, in charge of section two, of the Erie canal, including the portions thereof hereafter mentioned, under instructions from the canal commissioners to act promptly whenever a break occurred, and restore the canal to a navigable condition as speedily as practicable, at all hazards. At Vischer's Ferry the canal runs nearly east and west. On the northerly side of the canal was a basin, forming part of the canal itself, covering about half an acre. At the northerly point of the basin were two lock-gates, belonging to the State, separating the basin of the canal from a dry dock, covering about a quarter of an acre, the private property of one Alexander Sherman, into which boats were taken from the canal for repairs. These lock-gates opened southerly into the canal. On the easterly side of Sherman's dry dock he had a waste-weir for letting off surplus water. A short distance west of the dry dock was a culvert, under the canal, the property of the State, through which, from the north, a creek, called Stony creek, ran into the Mohawk river, southerly of the canal. The lock-gates, owned by the State, were used as a waste-weir to let off the water from the canal, which passed into the dry dock, and out of that, through the gates thereof belonging to its owner, into a ravine, through which it ran into Stony creek, above the culvert. The creek was of considerable size, and above the culvert fell rapidly. The State kept no one in charge of the lock-gates, but they were opened by Sherman, and those in his employ, to let boats from the basin into the dry dock, they immediately thereafter closing them again. On the 18th of May there was a severe spring rain, which raised the water in the river, creek and canal, creating a freshet, filling the canal so that the water ran over its banks. This was the condition of the river, the creek and the canal, on the 19th of May. Two or three days previous to the 19th, the plaintiff's canal boat, the " G. W. Ganung," had been thus run from the canal into this dry dock for repairs. On the 19th of May, the canal was in a navigable condition the whole length thereof, and a large number of boats were

navigating it. On that day, when the canal, the creek, and the river were in such a swollen condition, the canal lock-gates were opened by Sherman's men in charge of the dry dock, and the captain and crew of plaintiff's boat commenced running her, stern foremost, into the canal. When she was nearly half way through the gates, the waste-weir and gates of Sherman's dry dock suddenly gave way, creating a large breach in the bank thereof; in consequence of which the water ran rapidly out of the dry dock and of that, a three mile level of the canal. This left the boat between the open gates of the canal, resting upon the miter sill. She was about ninety-five feet long; about forty-five feet lay in the basin of the canal, and the remainder in the dry dock. The lock-gates of the canal could not be closed, and navigation thus resumed, until the boat was removed. The defendant was notified of the break, and arrived on the ground about nine o'clock in the morning. He examined and deliberated upon the situation, and upon the several modes of restoring the navigation of the canal. Four methods were possible: 1. To dam up the culvert under the canal, so as to raise the water above it high enough to set it back up the ravine into the dry dock and level of the canal, deep enough to float the boat. This would have been only an experiment, and, if successful, would have been fraught with danger to the canal. 2. By repairing the banks of Sherman's dry dock, which might have been done in two days, so as to have permitted sufficient water to have been let into the canal and dry dock to float the boat out of the gates, so they could be closed, and navigation resumed. 3. By building a coffer dam, in the basin of the canal, around the stern of the boat, which could have been done in two or three days, at a cost of $900, and $250 to $350 for removal. 4. By cutting out of plaintiff's boat a piece thereof of sufficient length to enable him to close the gates between the canal and the dry dock, and let the water into the level, which could be done in about twelve hours. This involved the destruction of property, the value of which did not much

exceed the expense of restoring navigation in either of the other ways. The defendant, in good faith, exercised his judgment and discretion in the premises, and in good faith determined that the best method of restoring navigation was to cut out of plaintiff's boat a piece large enough to enable him to close the gates of the lock. He ordered it done, and it was done, without any want of care in the act of severing the boat; the pieces cut out being just long enough to allow the gates to be closed. The injury done to the boat was no greater than the act necessarily involved. Every day's delay in restoring navigation caused great damage to the State and to persons navigating the canal. The plaintiff's boat grounded in the gates of the lock, without any fault or negligence on the part of the plaintiff or his servants or agents; he was not notified to remove the boat, and no time nor opportunity was given him to do so. No evidence was given on the trial that at or prior to the time defendant commenced cutting up the boat the plaintiff, or his servants or agents, had commenced removing it from between the lock-gates or had taken any steps to do so, or that when defendant commenced removing it they designed to or would do so. The defendant, at the close of plaintiff's testimony, moved for a nonsuit, and again at the close of the evidence. The motions were denied, defendant each time excepting. The referee assessed plaintiff's damages at $1,500 and interest from the time of cutting up the boat. As conclusion of law, he held defendant liable, to which he excepted, and on the entry of judgment appealed therefrom to this court.

*N. C. Moak,* for the appellant.

*Isaac Lawson,* for the respondent.

Present—MILLER, INGALLS and PECKHAM, JJ.

By the Court—INGALLS, J. It was the duty of the defendant, as superintendent of repairs on the Erie canal, to remove obstructions which hindered or prevented navigation thereon.

Hicks v. Dorn.

(*Adsit* v. *Brady*, 4 Hill, 630 ; *Fulton Fire Insurance Co.* v. *Baldwin*, 37 N. Y., 648.) It was not only made his duty by law, but he was expressly instructed by the canal commissioners to discharge that duty. The referee finds that the defendant acted in good faith in all that he did, and the injury to the plaintiff's property was no greater than the act necessarily involved. The defendant properly determined in regard to the necessity and propriety of removing the defendant's boat as an obstruction, and can only be held responsible upon the ground that he was chargeable with negligence, or improper conduct in executing the work. The right of an individual in regard to his property should be respected ; and even public officers are not at liberty to disregard such rights, unless there is a clear and urgent necessity therefor, to subserve an important and pressing public necessity. Mere convenience on the part of the public in regard to the mode to be adopted in accomplishing a result, would not, in my judgment, create such a necessity as would justify a material injury to, or destruction of, the property of an individual. Certainly not, if any other legitimate mode could be resorted to, and produce the same result, without serious injury to public interests. In other words, there must exist a pressing necessity, both in regard to the work to be performed, and the manner in which it should be executed, to justify such an act. No other rule would be safe, or furnish adequate protection to the citizen, against the encroachment of superior power. It is not pretended that the plaintiff was guilty of negligence, or improper conduct, in the management of his boat. The question therefore, presented for the determination of the referee was, whether, in view of all the circumstances, it was necessary for the defendant to destroy the plaintiff's boat, in order to remove it, as an obstruction to navigation. In determining this question, it became necessary for him to ascertain, from the evidence, whether the defendant could not reasonably have adopted some other method to accomplish the same result, and thereby avoided doing the plaintiff such serious injury. If the defendant could have repaired the breach occasioned

by the water, by a resort to *ordinary means,* and thereby
continued navigation, without material interruption, or
serious detriment to the public welfare, it certainly was his
duty to have done so, instead of adopting this *extraordinary*
measure, so frought with injury to the plaintiff. The evidence
discloses, and the referee has found, that there were several
methods by which the obstruction could have been removed,
and the difficulty obviated, which were brought to the atten-
tion of the defendant before he entered upon the work. One
was, by constructing a coffer dam in the basin of the canal,
around the stern of the boat, and raising the water so as to
float the boat, which could have been accomplished in
two or three days, at an expense of $900, and $250 or
$300 to remove the dam. Another was, to repair the
banks of the dry dock, which could have been done in
two days. Another, by damming up the culvert, and thereby
raising the water so as to float the boat and close the
gates. It appears, that from eight to ten hours were
expended in cutting the boat, and about twelve hours to
restore navigation, and plaintiff was damaged to the extent
of $1,500. There is considerable evidence, bearing upon the
feasibility of the several methods. In my opinion, a fair
question of fact was presented for the determination of the
referee, whether, in view of all the circumstances, the
defendant exercised reasonable prudence in executing the
work in question; whether he was justifiable in pursuing
an extraordinary, rather than an ordinary method, in remov-
ing the obstruction. The evidence shows pretty clearly that,
with possibly some additional delay and expense, the work
could have been accomplished, and the plaintiff's property
preserved. Is it just or reasonable to conclude in this case,
that there existed, what Senator Sherman, in his opinion in
*Russel v. The Mayor, &c., of New York* (2 Denio, 475),
denominated "an overruling necessity," which justified the
sacrifice of the plaintiff's property? I am of opinion that,
at least, the evidence does not so far preponderate, in that
direction, as to call upon this court to reverse the decision

The People v. Hillhouse.

of the referee, in that particular. In what the defendant did, after he determined the necessity of removing the obstruction, I think he must be deemed to have acted ministerially, and was, therefore, bound to exercise reasonable care, prudence, and discretion, in performing the work. (*Barton* v. *The City of Syracuse*, 36 N. Y., 54; *Robinson* v. *Chamberlain*, 34 N. Y., 389; *Rochester W. Lead Company* v. *City of Rochester*, 3 N. Y., 463.)

Due regard for the interests of the public, by public officers, is commendable, and they are entitled to reasonable protection, when acting within the scope of their authority, and in good faith; but the rights of the citizen should not be disregarded, by improperly imposing upon him a burden which should be borne by the State. The plaintiff was free from blame, and the expense of the work in question was properly chargeable to the State; and under the facts of this case, the defendant was not justified in destroying the plaintiff's property, and thereby subjecting him to the loss, instead of, by some other means, removing the obstructions at the expense of the State. Whether the State will allow its servant, who has acted in good faith, and but too strictly in its favor, for the interest or even the right of the plaintiff, to suffer, is not for us to speculate upon. The judgment should be affirmed, with costs.

Judgment affirmed.*