## City of Philadelphia *versus* Gilmartin.

1. By Act of April 9th 1807, Kennedy was authorized to dig a race to his mill at the Falls of Schuylkill, and lead so much water of the Schuylkill as might be necessary for machinery, &c., with the proviso that he should not obstruct the navigation, and if the city should wish to erect machinery to conduct water to it, such right was reserved, the city to be liable to pay Kennedy his expenses, and 20 per cent. on conveyance being made of the whole of his right. *Held*, that the act granted a mere private right to Kennedy, and the proviso in favor of the city gave her no right to the water which would impair the navigation.

2. The rights of the public for navigation of the Schuylkill are superior to those of the city under the Act of 1807, and her contracts with the Schuylkill Navigation Company.

3. In a time of drought the water of the Schuylkill was so used by the city as to prevent navigation. In an action by a boat-owner detained by this use, *Held*, that the acts and declarations of the mayor, councils, engi-

[City of Philadelphia *v.* Gilmartin.]

neer, and other officers in relation to this matter were evidence against the city.

4. The city was a vendor of water to her citizens, &c., the officers having direction of the waterworks and the city stand in the relation of principal and agent: they are not officers performing municipal functions merely; the city is liable for their negligence and irregularities in the scope of their duties.

5. The right of the city to draw water for purposes of manufacturing, &c., and also for baths, &c., as well as for propelling power, is subordinate to the right of navigation.

6. City *v.* Collins, 18 P. F. Smith 106, affirmed.

February 28th and 29th and March 1st 1872. Before AGNEW, SHARSWOOD and WILLIAMS, JJ. THOMPSON, C. J., at Nisi Prius.

Error to the District Court of *Philadelphia:* No. 102, to January Term 1872.

This was an action on the case, commenced November 10th 1869, by John Gilmartin against the City of Philadelphia.

The cause of action was, that the defendant, by reason of the drawing off of the water of Schuylkill river, so reduced it that the plaintiff, the owner of a canal-boat navigating .by means of the canal, &c., of the Schuylkill Navigation Company, could not proceed, and had been detained at Manayunk from the 9th of August till the 7th of* September 1869.

The detention occurred during a season of most extraordinary drought.

On the 9th of April 1807, Robert Kennedy was authorized by Act of Assemby of that date, "to dig and support a mill-race" at the Falls of Schuylkill, "to lead the water necessary for a grist and saw-mill;" he to keep in repair a lock for the passage of boats, and prohibiting Kennedy from obstructing the navigation of the river Schuylkill. It was provided by the act that if the city of Philadelphia should thereafter erect machinery, and such erection should injure the works of Kennedy, the city should pay the reasonable expenses of Kennedy, with 20 per cent. on conveyance being made by him of the whole of his right; if Kennedy should exceed his authority or encroach on the rights of the public he should be liable to indictment. On the 31st of March 1810, Kennedy granted to Josiah White all the right he had acquired under this act. On the 8th of March 1815, the Schuylkill Navigation Company was incorporated. The act of incorporation (sect. 15, 6 Sm. L. 261) authorized the company to use the water-power from the river, canal, &c., to propel machinery, or sell or rent the water-power, provided "it be so done as not to impede or interrupt the navigation," &c. On the 14th of August 1816, the Schuylkill Navigation Company granted to Josiah White, his heirs and assigns, the right to erect a dam at the Falls of Schuylkill, and all the rights of the company under their act of incorporation, with the proviso that the water should be used, &c., so that it

[City of Philadelphia *v.* Gilmartin.]

should not impede or interrupt or injure the navigation of the river or canal.

On the 1st of January 1817, White granted to Joseph Gillingham a portion of the water-power which he owned, and subsequently Gillingham and White conveyed their rights in the water, &c., to the city of Philadelphia.

On the 3d of June 1819, the Schuylkill Navigation Company and the city of Philadelphia entered into an agreement, reciting amongst other things that,

"The mayor, &c., of Philadelphia, being desirous to increase the supply of water raised from the river Schuylkill for the use of the said city, and for vending the same, if they see fit, to the adjoining districts, as well as for such other purposes as are hereinafter mentioned, by means of a new and enlarged power to be obtained by the erection of a dam to be built therein, near to their present water-works : and, the said Navigation Company, fully sensible of the importance of such improvements, and willing to give effect to the same so far as may be done under their charter of incorporation, and having at the same time respect to the navigation of the said river, which by the erection of such works may be improved and extended, have agreed with the said mayor, aldermen, and citizens of Philadelphia to allow of such improvements under the conditions, stipulations, and agreements hereinafter mentioned." And it was agreed, that in order to fulfil the intention and meaning of said parties, and also the Acts of Assembly before mentioned, the said parties have contracted and agreed mutually with each other with respect to the improvements to be made by the said mayor, &c., of Philadelphia, at or near to Fairmount, Philadelphia county, as follows, to wit : "They the said company, &c., grant to the said mayor, &c., the right, and they the said mayor, &c., agree to erect a dam as hereinafter directed, across the said river near to Fairmount, at, &c., the said dam to be built conformably to the charter of incorporation of the said Navigation Company," &c.

"It is hereby mutually understood, &c., that the said company, &c., shall and may at all times draw off from the said dam as much water as they may deem necessary for the purpose of the navigation, and that the said mayor, &c., shall and may enjoy all the remainder of the water of the said river for the purposes hereinafter mentioned : *Provided,* They do not at any time reduce the same or keep the same reduced below the level of the surface or top of the said dam, it being the design and meaning of the parties that the said mayor, &c., shall only have such use of the water as with the use thereof by the said company will not reduce it below the said surface or top of the dam, or keep it so reduced. And the said dam is to be kept up and in good and sufficient repair at all times and for ever by the said mayor, &c. * * *

"And the said parties hereby further covenant and agree, that

[City of Philadelphia v. Gilmartin.]

the said mayor, aldermen, and citizens of Philadelphia, and their successors, shall not sell, lease, or dispose of any water-power of the said river Schuylkill, nor the said water-power for manufacturing purposes, except only for boring pipes, pumps, and such other matters and things as may be useful to and connected with the said public works of the said mayor, &c." * * *

Another agreement was entered into on the 20th of July 1820, between the Navigation Company and the city of Philadelphia, by which it was stipulated that the city might raise their dam at Fairmount eighteen inches, &c.

A third agreement was entered into on the 14th of June 1824, between the Navigation Company and the city; by which after reciting the various agreements previously made between them, and other matters, stipulated that the city should forever have, use, &c., " the whole water and water-power of the river Schuylkill, at Fairmount, that shall remain after drawing off from the dam there erected so much as may be necessary for the purpose of the navigation of the said river, canal, and locks, without any restriction or other reservation whatever, and that it shall and may be lawful to and for the said mayor, &c., to lease, sell, or dispose of the said water-power, and to use the same, &c., for any and every purpose whatsoever, without any let or hindrance by the said company or by reason of any restriction contained in the articles of agreement hereinbefore recited, or either of them, &c. * * * It being nevertheless the true intent and meaning of the parties to these presents, that the said the mayor, &c., shall only have such use of the said water, as with the use thereof for the purpose of the navigation aforesaid, will not reduce it below the surface or top of the said dam, or keep it so reduced. * * *

" And it is further agreed by and between the parties to these presents, that they, the mayor, &c., shall and will have and take charge of the locks and canal aforesaid at Fairmount, *and at all times hereafter for ever*, cause the same to be well and faithfully attended, and *kept in good order and repair*, at the proper expense of the said mayor, &c. * * * That the said company shall and they do hereby retain the right of superintending the management of the said locks and canal, &c. * * * And that they shall be and are hereby authorized and empowered, at the expense of the said mayor, &c., to remove any obstructions, and make any repairs, which, according to the true intent of these presents, or the said recited agreements, the said mayor, aldermen, and citizens of Philadelphia are bound, and shall, after reasonable notice, neglect to remove and make. * * * And it is also further agreed, &c., that should it at any time happen that the water should be drawn off below the top or surface of the dam, it shall be lawful for the said president, managers, and company to fasten up the gates or openings used by the said mayor, &c., to draw off the water, and keep

21 P. F. SMITH—10

the same fastened until the water shall be raised as high as the top or surface of the dam." * * *

The cause was tried October 19th 1871, before Thayer, J.

Gilmartin testified that he reached Manayunk with his canal-boat on the 9th of August and was detained until the 7th of September when he passed through the Fairmount locks, he had 184 tons of coal on his boat, which drew about five feet five inches. He testified also, and gave other evidence as to the amount of damage which had been sustained by the detention.

John Frick, a toll collector of the Navigation Company, testified that the water was below the comb of Fairmount dam in August 1869; the persons in charge of the city water-works declined to comply with his request to close the gates to the city water-works, saying they had been instructed by their superior officers not to do so; afterward they were closed and the water rose so as to enable some boats to pass; they were opened again August 11th, and afterward the city agents positively refused to close them; the water got down again, so that boats grounded and the navigation was stopped until August 16th; on that day several boats passed through; after that the water was drawn down, the city would not allow the company to pass any boats, and the navigation was stopped till September 7th, after which there was no difficulty in getting the boats through; there were narrow strips put on the dam by the city, as had been done for several years; the stoppage was occasioned by drawing down the water at Fairmount dam; orders had been received from the company on the 14th of August not to lock boats through until further instructions; no boat could have got through until September 7th except a short time on August 16th. The company's locks leaked some.

There was evidence that the shallowest part of the navigation was opposite Penncoyd Works, that there is there an outside channel but a very difficult one.

Frederick Graff, the chief engineer of the city water-works, testified that power to drive the works is derived from the Fairmount pool, that it takes $13\frac{1}{2}$ gallons for power to pump 1 gallon with turbine wheels and 22 to 27 gallons with breast-wheels. After several interviews and correspondence with company, he requested the company to close their gates, and they were closed in pursuance of an agreement between them and the witness in order to supply the city with water, using the water also for power; on the 7th of September steam-engines commenced working; during August the water on an average was about $3\frac{1}{10}$ inches below the comb of the dam; there were no adequate means for power except the water; the deficiency of power had been the subject of his annual reports for fifteen years. The average use of water by the citizens during the drought was less than usual; "Everything

[City of Philadelphia v. Gilmartin.]

was done to make the use of the water as economical as possible; the city was put on a minimum allowance of water at that time."

The company had stores of water in pools above Fairmount and below Reading, which were let down about September 7th and aided in the resumption of navigation; by thus drawing the water the navigation in these pools would be obstructed.

The plaintiff then offered in evidence the following papers, &c., which were all admitted under objection and exception:

Letter, August 7th 1869, from W. M. Tilghman, Esq., secretary of the company, to Mr. Graff, in which Mr. Tilghman, referring to the obstructions of the navigation by the action of the water department, informs Mr. Graff that to prevent their recurrence the company will urge upon the city authorities that they provide a steam-engine for forcing power, &c.

* * * "We propose this course, in the first instance, rather than a resort to legal proceedings, because we are aware that every effort on your part has been made to comply with the agreement between the city and this company, under which alone the former derives its right to use the water of Fairmount pool as a motive power, and that the repeated violations of that agreement, by drawing off the water below the level of the top dam, are frankly admitted and explained, without being attempted to be legally justified upon the ground that they were *necessary* in order to supply the city with water. The object of this note is simply to place upon record the above facts, and to express the hope that you will at the earliest moment call the attention of the watering committee to them." * * *

Letter August 11th 1869 from same to Mayor Fox, enclosing copy of the foregoing letter, and saying that the present mode of obtaining power, would supply the city but a short time, that the city was incurring heavy liability by obstructing the navigation, &c., admitting that the city might use the water without limit for distribution from the reservoirs; denying the right of the city to use the water for propelling power, and asserting that there would be enough water for the navigation and the wants of the city if the water were not so used; that such use of the water would be avoided by the use of steam-power which the city had not employed solely to save the cost, that the rights granted by the company to the city under their several agreements, were the same as those to which the company was restricted by the charter, viz., that after draining off the dam at Fairmount, there should remain what would be necessary for navigation and that the use of the water should not reduce it below the top of the dam; that the pool had frequently been drawn below the top of the dam, and urging that the city should provide means to avoid the difficulty.

Letter August 14th, Mr. Graff to C. W. Wharton, assistant president of the company, asking that the upper pools be drawn

and reply of same date, Mr. Wharton to Mr. Graff, informing him that he had authorized the drawing down of the upper pools, relying upon the city for indemnity against losses occasioned thereby, &c.

A number of telegrams, all of August 14th, between the officers of the company, Mr. Graff and J. F. Smith, superintendent of company at Reading, in relation to drawing down the water from the upper pools. Other letters between the mayor, Mr. Graff, Mr. Tilghman, and other officers of the company, on the general subject of the use of the water by the city, &c.

Message August 23d, the mayor to the councils, transmitting the correspondence with the officers of the company, referring to the use of the water by the city contrary to its agreement with the company, as resulting from its propelling power; urging provision for payment of losses occasioned by the stoppage of the navigation, &c.

Report August 23d, Mr. Graff to councils, in relation to the general subject, and recommending modes for remedy in the future.

Ordinance of councils August 23d, in accordance with report of a committee appropriating $25,000 to the water department "for the purpose of payment to the Schuylkill Navigation Company, *Provided*, That if the said Schuylkill Navigation Company shall hereafter establish any claim against the city, this amount shall be considered as an offset 'pro tanto' to said claim," &c.

Mr. Graff further testified that all his actions between August 14th and September 7th were with the assent of the company. A steam-tug was employed from September 7th to force the water, the amount of water saved by its use 27,000,000 gallons per day. There was evidence that drawing down the upper pools greatly injured the navigation; that the draft boats had been increased from about 3⅓ feet to 5 and 5½ feet; there was no channel from Manayunk to Fairmount except that pursued by the boats.

The plaintiff, under objection and exception, gave evidence by J. H. Hutchinson, a director of the company, that on the 11th of August, the mayor informed a committee of the company that if the company should attempt to close the head gates of the dam, he would resist such action by the whole police force of the city. All then agreed that the attempt would be useless, and that no right would be waived by abstaining from it.

The defendants gave evidence that the outside channel at Penncoyd could be and had been used when the other channel was too low; also evidence that there was large leakage at company's locks at Fairmount. The documentary evidence will be found in detail in City *v.* Collins, 18 P. F. Smith 106.

The plaintiff submitted four points, the last of which was:

If the jury believe that a depth of water, sufficient for the navigation of loaded boats of the usual draught, had been provided in Fairmount pool by means of the temporary strip placed upon the dam by the Navigation Company, the depth of water so obtained

was lawful, and the defendants had no right to diminish it by taking the water for water-power, if by so doing they impeded or interrupted the navigation of such boats.

The defendant's points were :

1. For the purposes of this case, the right of the City of Philadelphia to the water and water-power of the Schuylkill vested in it by the Act of 1807, and the deed of Josiah White, and the only restrictions of this act are, that the dam and race shall not obstruct the navigation at the lower fall, and that the channel then used at that place should be left open for boats to pass as they did prior to that date.

2. If the jury believe from the evidence that the boat of the plaintiff was detained above the lower falls, and that no works of the city were at that place, and that the channel used before 1807 was left open for boats to pass as they did before that time, then the city is not responsible for the detention, and the plaintiff cannot recover.

3. If the jury find from the evidence that the boat was detained below the lower falls, and there was between that point and the dam sufficient water in the river to float the boat and to lock it through the canal, then the city took no more water than they were authorized to do under the Act of 1807, and the plaintiff cannot recover.

4. The limitation or restriction in the Act of 1807 applies only to boats of such draught as navigated the river before that time.

5. If the jury find from the evidence that, whilst the capacity of the locks and the draught of the boats have been increased, the Navigation Company has not made a proportionate increase in the depth of the canal channel in the upper portion of Fairmount pool, the Navigation Company alone is responsible for any detention caused by such want of depth, and plaintiff cannot recover.

6. If the jury find from the evidence that anywhere in the river there was a channel of sufficient depth to float boats from Manayunk locks to the Fairmount dam, the plaintiff cannot recover.

7. If the jury believe from the evidence that through the negligence of the Navigation Company there was sufficient water wasted at the Fairmount locks to have kept the water in the dam at a sufficient height to have floated the plaintiff's boat, the Navigation Company alone is liable, and the plaintiff cannot recover in this action.

8. If the jury find from the evidence that the water wasted, together with the water stored in reservoirs and contained in dams beyond the demands of navigation, would have kept up the navigation, the Navigation Company alone is liable, and plaintiff cannot recover in this action.

9. The right of the city to draw water from the pool at

Fairmount is superior to that of all other persons, except only such water as is necessary for the sole purpose of lockage, and if the jury find from the evidence that water was drawn from the dam by the Navigation Company to a greater extent than was necessary for lockage, and to a sufficient extent to impede navigation, the plaintiff cannot recover in this action.

10. The City of Philadelphia, the defendants in this suit, are not liable for any action of the chief engineer of the water department beyond the scope of his authority, and any interference by him with the outlet locks of the Navigation Company at Fairmount was outside of and beyond such authority, and is not binding upon the city.

11. If the jury believe from the evidence that the chief engineer of the water department assumed control of the locks, and did it at the suggestion of and in pursuance of authority given by the Schuylkill Navigation Company, then to that extent he was the agent of the company, and the company alone is responsible for any injury caused by the exercise of such authority or conduct of such agent, and the plaintiff cannot recover in this suit for any injury so caused.

12. If the jury believe from the evidence that the stoppage of the plaintiff's boat was occasioned by the act of the Schuylkill Navigation Company, in closing and keeping closed their locks in the manner described by the plaintiff's witnesses, during the time his boat was lying in the canal at Manayunk, then their verdict should be for the defendants.

13. If the jury believe from the evidence that the use by the city of the water of the river, in the way it was used by them, during the time the plaintiff's boat remained in the canal at Manayunk, would not have prevented the passage of his boat through the Fairmount pool and the outlet locks into the tideway, if the Navigation Company had done everything they were bound to do in the proper maintenance of their locks and in other respects, the plaintiff cannot recover in this suit.

14. If the jury find from the evidence that the stoppage of the plaintiff's boat was occasioned directly by the act of the Schuylkill Navigation Company, then the verdict should be for the defendants.

15. If the jury find from the evidence that the plaintiff contributed, by act or neglect, to the injury of which he complains, the verdict should be for the defendants.

16. Although the city had no right to reduce the water below the comb of the dam, yet, if the jury find from the evidence that the plaintiff's boat could not have navigated Fairmount pool, without a breast of water flowing over the dam, then the act of the city did not damage the plaintiff, and the verdict should be for the defendants.

[City of Philadelphia *v.* Gilmartin.]

17. If the jury find that the period of the detention of the plaintiff's boat was one of extraordinary drought along the line of the Schuylkill river, and that the city of Philadelphia used no more water than was reasonably needed for the supply of its inhabitants, including the amount requisite for power, the verdict should be for the defendants.

18. If the period of the detention of the plaintiff's boat was of extraordinary drought, and the low stage of the water and consequent detention of said boat was caused by such drought, and not by any unusual use of the water of the river by the city of Philadelphia to supply the actual necessities of the citizens, then the plaintiff is not entitled to recover.

The court charged at great length: the following extracts, with the opinion of the Supreme Court, will sufficiently elucidate the matters decided.

* * * " The plaintiff says that his detention was the immediate result of the unlawful act of the city in drawing from Fairmount dam so large a portion of the water of the river for the purpose of propelling the wheels of their water-works at Fairmount that the navigation was thereby impeded and interrupted; that the volume of water withdrawn reduced the stream to such an extent that the plaintiff was unable to pass with his boat from the Manayunk pool to the outlet locks at Fairmount. The plaintiff does not deny the right of the city to use the water of the Schuylkill river to any extent which may be necessary for drinking and domestic purposes, but he denies its right to use the water *as a power or propelling force* to an extent which shall impede or interrupt the artificial navigation constructed by the Schuylkill Navigation Company, under the authority of the state. He says that to do that is an unlawful act, an invasion of the right which every citizen of the Commonwealth has to the free and uninterrupted use of the navigation, and that it has caused the loss of which he complains.

" The defendants resist the plaintiff's suit upon several grounds.

" 1. They say that their act did not cause the plaintiff's detention.

" 2. That the detention was caused by the misconduct or negligence of the Navigation Company.

" 3. That the plaintiff's loss was caused in part, if not altogether, by his own negligence and want of ordinary skill and foresight.

" 4. That the low stage of the water and the plaintiff's detention were caused by an extraordinary and unusual drought, and not by any unlawful act committed by them.

" 5. They allege that they have a right to use the water of the river, not only for drinking and domestic purposes, *but for power,* which is paramount and superior to any right of the plaintiff to the navigation. * * *

[City of Philadelphia *v.* Gilmartin.]

"Now, in the first place, it is necessary to determine what was the nature of the grant which the city had for the use of the water-power.

"The state, which was the depositary of all the franchises which belonged to the people, authorized the enterprise which was carried into effect by the Schuylkill Navigation Company—that is, the construction of the slack-water navigation.  The object of that improvement was the benefit of the public, and of all the citizens of the Commonwealth who chose to avail themselves of the advantages which the navigation would present.  The state, therefore, in granting the water-power, with the right to alienate it, had the right to couple the grant with any conditions which she might think proper, and she did couple the grant with the condition that the water-power should not be used in such a manner as to obstruct or impede the navigation which was contemplated by the Act of Assembly.

"The Navigation Company had no authority to grant any other use of the water-power than that which they were authorized by the Act of Assembly to grant.

"The power which they had was not a power to grant the water-power to any extent, but '*provided*, it did not impede or interrupt the navigation of the river'—that is, the navigation by the slack-water navigation, which it was contemplated to make.  The navigation company could not transfer, under its grant, to any person, a right to the water-power, which would be free from the condition which the state had annexed to the grant. * * *

"This, therefore, was the limit of the right of the city.  The city, under any circumstances, had no right, by using the water-power at Fairmount for the propulsion of their wheels, to reduce the water *below* the comb of the dam.  Whether they had the right to reduce it *to the surface* of the dam is a question which depends upon a question of fact; and that is, whether by reducing it to the surface of the dam the navigation was impeded.  If it impeded the navigation, then the city had no right to reduce the volume of water even to the surface of the dam; but so long as it did not impede the navigation, they might reduce it even with the surface of the dam, but no further.

"It is claimed, however, by the defendants, that notwithstanding this restraint upon the authority of the navigation company to transfer the use of the water-power, the city, by the Act of April 9th 1807, making the grant to Kennedy, had acquired a prior right which was paramount and superior to any right of the Navigation Company, or any other persons. * * *  The grant to Kennedy is guarded in precisely the same way by the legislature as the grant to the Navigation Company, viz., by an express proviso that the said Kennedy, his heirs and assigns, *shall not obstruct the navigation of the said river.* * * *

[City of Philadelphia v. Gilmartin.]

" Now, if Robert Kennedy could not use the water-power to the prejudice of the public, that is, in such manner as to impair the right of the public to the unobstructed navigation of the Schuylkill river, I need not tell you that any one claiming title under him, can have no right to do that thing; because the right acquired by the city from Kennedy could be no greater than the right which Kennedy himself possessed. * * But it is also argued that the other proviso contained in the grant to Kennedy, vested in the city an absolute right to the water-power, and a right which, being anterior to, was superior to the grant subsequently made to the Navigation Company. * * * The construction of this act, which is contended for by the defendants is, in my judgment, totally inconsistent with the act itself. It would be absurd to suppose that the state has given power to the city to destroy the navigation of the Schuylkill river by an act which expressly prohibits the obstruction of the navigation of that river. What then was meant by this proviso in the Act of 1807, relative to the future construction of water-works by the city? * * * The legislature reserved the right to repeal Kennedy's grant if they thought proper so to do, and provided that in that event he should be compensated for his losses in a certain designated manner. That is the whole scope and intent of the language used. It is not a present grant to the city, but a present grant to Kennedy, with the reservation of a right to repeal it in favor of the city if they should see proper so to do. It is inconsistent with all the other legislation of the state upon the same subject, and inconsistent with the whole subsequent conduct of the Navigation Company and the city herself. * * *

" Therefore it is my duty to say to you that neither under any Act of Assembly which has been shown, nor under any agreement which has been put in evidence before you, had the city the right to use the water of the Schuylkill river as a power or propelling force in a manner or to an extent which would impede or interrupt the navigation of that river. As between herself and the Navigation Company, the city had the right to use the water for power to an extent which would reduce the volume of the stream to the surface of the dam and no lower. If she exceeded that limit, she trespassed upon the rights of the Navigation Company. Whether as against a person lawfully navigating the stream she might reduce it to the surface of the dam, depends upon the fact whether by so doing she impeded or interrupted the navigation. She could not make any use of the water which would produce that result.

" Therefore you are to inquire, in the first place, whether the use which the city made of the water-power, was the cause of the plaintiff's detention. That is a question of fact for you and for you alone. * * *

" I feel it to be my duty to say to you that the existence of the

[City of Philadelphia *v.* Gilmartin.]

extraordinary drought would in no respect alter the rights of the parties, neither does the argument of necessity relieve the city from responsibility if she is otherwise responsible. A solemn contract and agreement is binding upon the parties at all seasons, in dry seasons and wet seasons alike, and under all circumstances, and a party cannot justify himself for violating the agreement by any severity or stress of weather or surrounding circumstances. Now, if there was a necessity for the city to have water, as undoubtedly there was, for the use of the citizens, obviously they might have had it by using some other power than the water itself. * * *

" So far then as the legal aspects of the case are concerned, I sum them up in the following propositions :—

"1. The city has no right, either under the grant to Robert Kennedy, by the Act of 9th of April 1807, or under the agreement with the Navigation Company of June 3d 1819, to use the water-power of the Schuylkill river to an extent which will impede or interrupt the navigation. If the city has done that, and if the plaintiff's detention was caused by it, and if his detention was not due in any degree to his own negligence, then your verdict should be for the plaintiff.

" 2. If you can find that the plaintiff's detention was due to the misconduct or negligence of the Navigation Company alone, and not to any act of the city, then your verdict should be for the defendants. But you are not to find that except upon sufficient evidence.

" 3. If you find that the plaintiff's detention was due to the combined unlawful acts of the city and the Navigation Company, then your verdict should be for the plaintiff.

" 4. If you find that the plaintiff's detention was due to his own negligence, either in whole or in part, then your verdict must be for the defendants. * * *

" I decline to give any further instructions upon the first nine points presented by the defendants' counsel than those which I have already given in my general charge.

" In answer to the defendants' tenth point, I instruct you that the action against the city is for an unlawful diversion of the water, and not for shutting down the gates of the locks or for interfering with the locks. If the plaintiff's detention was not owing to an unlawful use of the water-power by the city, then the city is not responsible and the verdict must be for the defendants.

" I make the same answer to the defendants' eleventh point.

" In answer to the defendants' twelfth point, I instruct you that if the plaintiff's detention was caused by the act of the Schuylkill Navigation Company in closing and keeping closed their locks, and not by the unlawful use of the water-power by the city, then your verdict must be for the defendants.

[City of Philadelphia *v.* Gilmartin.]

" In answer to the defendants' thirteenth point, I decline to give any further instruction upon the subject of negligence on the part of the Navigation Company than that which I have already given in my general charge.

" In answer to defendants' fourteenth point, I instruct you, if the stoppage of the plaintiff's boat was occasioned by the act of the Schuylkill Navigation Company, and not by the act of the city, the defendants are not responsible.

" If the Navigation Company closed the locks when there was water enough in the pool for the plaintiff's boat to pass, and if such closing was the cause of detention, and not the low stage of the water in the pool, then the defendants are not responsible to the plaintiff for the detention.

" I feel bound, however, in fairness to say, in connection with that, that it appears to me that one of two things must be admitted, viz., either that the Navigation Company closed these gates because the water was too low to allow of the passage of boats, or else they closed them in order to facilitate the operations of the city in filling their reservoirs.

" Now, in either case, the city would not be relieved from responsibility. If they closed the gates because there was not sufficient water, why then if the lack of water was unlawfully produced by the defendants, the defendants are responsible. If they closed the gates in order to enable the chief engineer of the Fairmount water-works to avail himself of the water for the purpose of filling the reservoirs; for the purpose of driving his wheels at Fairmount in order to pump the water into the reservoirs, and in that way to protect the city of Philadelphia and its people from disaster and suffering, then, although that would be an act of co-operation on the part of the company with the city in the detention of the plaintiff, yet the fact of such co-operation would not relieve the city from liability if the cause of the plaintiff's detention was the taking of the water unlawfully by the defendant. It is no defence to an action for damages for a wrong, that other people contributed to the wrong, and aided in the perpetration of it. That is never either a defence or excuse at law for the commission of a wrong.

" I affirm the fifteenth point made by the defendants without qualification. If you find that the plaintiff contributed, by his act or neglect, to the injury of which he complains, then your verdict must be for the defendants.

" By the defendants' sixteenth point I am requested to charge you that, ' although the city had no right to reduce the water below the comb of the dam, yet, if the jury find from the evidence that plaintiff's boat could not have navigated Fairmount pool without a breast of water flowing over the dam, then the act of the city did not damage the plaintiff, and the verdict should be for the defendants.'

[City of Philadelphia *v.* Gilmartin.]

"In answer to that I say that I must decline to instruct you as requested in this point; for I say to you, whether the city was justified in drawing off the water to the extent of reducing it to the level of the surface of the dam depends upon this, viz., whether such a use of it impeded or interrupted the navigation.

"By the 15th section of the charter the company could not sell or grant any water-power which would have the effect of impeding or interrupting the navigation.

"I leave it as a question of fact for you to determine whether reducing the water to the level of the surface of the dam impeded or obstructed the navigation.

"As to the defendants' seventeenth and eighteenth points, I must decline to instruct you as requested by the defendants. They relate to that part of the defence which is founded upon an alleged extraordinary character of the season. I consider that any unexpected event of that kind cannot either increase or diminish the rights which are secured by law. The law is made for all seasons, and it is to be supreme in all seasons, and the right which the city had not in a wet season she cannot have in a dry season.

"I affirm the plaintiff's fourth point."

The verdict was for the plaintiff for $327.23.

The defendants took out a writ of error and assigned 12 errors:

1–7. The admission of the testimony objected to.

8. Affirming the plaintiff's 4th point.

9–11. The answers to the defendants' 14th, 16th, 17th and 18th points.

12. The answer as contained in the general charge, to the dedants' first nine points.

*W. H. Yerkes* and *G. W. Biddle* (with whom were *C. H. T. Collis*, City-Solicitor, *W. B. Mann* and *F. Carroll Brewster*, Attorney-General), for plaintiff in error.

*R. C. McMurtrie* and *W. M. Tilghman* (with whom was *M. P. Henry*), for defendant in error.

The opinion of the court was delivered, March 18th 1872, by

AGNEW, J.—In the court below the plaintiff claimed damages arising from a diversion of the water of the Schuylkill river, to supply the city water-works at Fairmount. The navigation was impeded, and his boat was detained in her voyage from the 9th of August until the 8th of September 1869. The season was one of unexampled drought, and several interesting questions arose in the trial. These had been decided in a former case: The City *v.* Collins, 18 P. F. Smith 106, in an opinion delivered by the Chief Justice. It is now alleged that that case was not fully argued; indeed it is said by the counsel that the question of the liability of the city for the acts of her officers, was not apprehended by

themselves, in all its bearing, and we are asked, therefore, to review this and several other points in the case. The City v. Collins was ably argued and well considered, yet, in deference to the wishes of the counsel, and in view of the important consequences to the city, we have re-examined the following questions, viz. :

The extent of the alleged grant to the city, contained in the proviso to the Act of 1807.

The extent of the rights of the city under the contracts with the Schuylkill Navigation Company.

The liabilities of the city for the acts of its agents and officers.

The influence of the unexampled drought upon the rights and duties of the parties.

We cannot see in the reservation in the proviso to the Act of 1807, of the right to erect works or machinery for the purpose of conducting the waters of the river to the city, any grant of these waters prejudicial to the navigation of the stream. That act granted to Robert Kennedy a private right only to construct a race and lead off so much water as should be necessary for his mills, subject to the condition that he should not obstruct the navigation of the river, or prevent the fish from passing up. The proviso in favor of the city was an exception merely to this private grant, and while it was a root from which rights might spring, it defined none, and pledged the state to no extent of enjoyment of the water by the city, which would interrupt or impair the navigation. A contrary interpretation has been given to the proviso by all the parties—the state, the Navigation Company, and the city, by legislation and by contracts acted upon and recognised for half a century. By the Act of the 8th of March 1815, incorporating the Schuylkill Navigation Company, to make a slack-water navigation by means of dams, locks and other devices, the stream was devoted to this purpose. The 15th section conferred upon the company the right to use the water-power of the *river, sluices and canals* to propel machinery, or to sell in fee simple or lease the water-power to others; but with the proviso that it should be so done, that it should not *at any time impede or interrupt navigation.* This law is directly at variance with the right now claimed for the city to impair the navigation; and so the city and the company understood it.

This brings us to consider the extent of the rights of the city under her contracts with the company. The first agreement is dated June 3d 1819. It recites the claim of title by the city to the grant of the private right to Robert Kennedy, through certain mesne conveyances, and settles and adjusts the mutual interests of the company and the city in the waters of the stream. The company stipulated for its right *at all times* to draw off as much water as they should deem necessary for the purposes of the navigation;

[City of Philadelphia *v.* Gilmartin.]

and the city bound herself not to reduce the water below the top level of the dam at Fairmount; and not to sell, lease, dispose of any water-power, or to use it for manufacturing purposes except a certain limited use to be made by the city. The city reserved any rights she had under the Act of 1807; but it is obvious this was a mere precaution, and did not enlarge the rights of the city which were expressly defined by the agreement. It limited the extent of her use of the water and water-power in the most precise terms. The vague and undefined right contained in the proviso thus became clearly fixed and ascertained by the agreement. The express terms of the contract cannot be set aside by such an undefined reservation.

Then came the agreement of July 20th 1820, enabling the city to add eighteen inches to the height of the dam; but otherwise confirming the agreement of 1819. This was followed by the agreement of June 14th 1824, granting to the city the whole water-power of the river produced by the Fairmount dam, and the use of the whole water of the river there, *that should remain after drawing off what should be necessary for the purpose of the navigation of the river.* To prevent misconstruction, this new concession is followed by the express declaration of the true intent of the parties, that the city should have such use only, of the water, as with the use thereof for the purpose of the navigation would not reduce it below the surface of the dam, or keep it so reduced. To enforce and protect the right of the navigation, it was agreed that should it at any time happen that the water should be drawn off below the top or surface of the dam, it should be lawful for the Navigation Company to fasten up the gates or openings used by the city to draw off the water, and to keep them fastened until the water should be raised as high as the top or surface of the dam.

The Schuylkill river was recognised by William Penn as a navigable stream: Proud's History of Pennsylvania 252. It has been classed as navigable along with the Ohio, Monongahela, Allegheny, Susquehanna, Lehigh and Delaware, and many laws have been passed recognising it as such: Shrunk *v.* Nav. Co., 14 S. & R. 79, 80, 81; McKeen *v.* Delaware Div. Canal Co., 13 Wright 433. In view of the navigable character of this stream, and of the policy of this state to improve and preserve the navigation of all her navigable rivers, and in view of the acts of the state, and the contracts of the Navigation Company and the city in regard to this very stream, it is impossible to doubt the superior right of the public to the use of the Schuylkill for navigation, and the consequent subordination of the rights of the city thereto.

We come now to the question of the liability of the city for the acts of her agents and officers in relation to the use of the water of the Schuylkill. This inquiry bears upon the case in two aspects, viz., the competency of the evidence in the bills of exception, and

[City of Philadelphia v. Gilmartin.]

the right of the plaintiff to maintain his action.  The agreements heretofore considered, and the other evidence in the cause, exhibit the city as the proprietor of a vast water-power, and its appropriate machinery, and of lands, buildings, reservoirs, and an extensive system of pipes, by which she distributes the water to nearly a million of people.  She sends it not only to private dwellings, but to public buildings, mills, manufactories, fountains, and to other uses.  She is a vender of water, and sells it for use in the arts, employments and pleasures of the people, deriving large revenues from the sales.  In carrying on this vast business and trade in water she stands in the relation of an owner of private property, and employs many agents performing the functions of servants, who are accountable to and report to the municipality, are governed by its regulations, and are supervised and controlled by the councils, committees and officers of the corporation.  Thus a mere statement of the facts discloses the relation of principal and agent in reference to the city water-works, and not that of ordinary corporation officers performing merely municipal functions.  The principle of the two cases relied on so much by the counsel of the city does not apply.  Mitchell v. City of Rockland, 52 Maine Reports 118, was a case where the health officers took possession of a vessel and used it with the consent of the owner as a hospital for a small-pox patient, and afterwards sent a person to fumigate and purify it, who accidentally caused a fire, by which the vessel was injured.  The city was held not to be liable for the injury because the health officers had no authority to take possession, and acted beyond their powers, and the city had no special property in the vessel.  Russell v. The Mayor of New York, 2 Denio 461, was an action to recover compensation for personal property destroyed by blowing up a building to arrest a fire, upon the order of the mayor and two aldermen acting under a statute. The duty being imposed by the statute on the officers and not on the city, and not by any city regulation, it was held that the city was not liable to respond in damages.  There was a question of necessity also discussed in that case, which does not bear upon the aspect of this case now under consideration.  I'shall come to that presently.  But in regard to municipal affairs the liability of the city is not so restricted as has been argued from the cases just cited.  In performing municipal functions only, the corporation must act through officers, for whose negligence and irregularities it must be held liable.  A municipal corporation is nothing more than an aggregation of persons, and it cannot be that liability is wholly lost in the number.  Men, whether as individuals or communities, have duties to perform which lie at the foundation of responsibility.  There are many decisions in this state which vindicate this just principle, to some of which I may refer.  For instance, an incorporated district, authorized to pave and grade a

[City of Philadelphia *v.* Gilmartin.]

public street, was held liable for an injury to a private right of way caused by the diversion of the water from the street upon the private way, on the ground that it had the power and was bound to make a proper provision for carrying off the water from the street : Commissioners of Kensington *v.* Wood, 10 Barr 93. So a city having charge of a public wharf for landing boats and receiving wharfage for it, was held liable for an injury to a steamboat caused by the neglect of her officers to remove a pile of iron lying there, within the period prescribed by ordinance for the removal : Pittsburg *v.* Grier, 10 Harris 55. The City of Erie also was held liable for the negligence of its officers in permitting a street to be used, without a warning of its imperfect condition caused by the loss of a bridge carried off by a flood; and a limitation in its charter of the percentage of tax to be levied in any one year was held to be no defence on the ground of a want of means to repair : Erie *v.* Schwingle, 10 Harris 384. In full accord is Humphreys *v.* Armstrong Co., 6 P. F. Smith 204, in which the county was made responsible for the acts and omissions of the commissioners in relation to an unsafe bridge which fell with the plaintiff's wagon and team. The bridge being on the line of two counties and maintained by both, it was afterwards held that Armstrong could recover contribution from Clarion county, notwithstanding the case was one of negligence : 16 P. F. Smith 218. A stronger case is Allegheny City *v.* McClurkan, 2 Harris 81, in which the city was held liable for the unauthorized contracts of its officers, entered into publicly so as to be within the knowledge of the citizens generally. The city was made to pay the issue of small notes or scrip issued by the councils, though contrary to the Act of 12th April 1828, forbidding the circulation of such notes. There were two questions in the case, the authority of the councils to issue the scrip and bind the city, and the invalidity of the notes on the ground of their illegality. In the former, the city was decided to be bound on the principle of ratification, on account of the public character of the act of the councils, and the benefit accruing to the city. In the latter, the validity was sustained under the terms of the third section, declaring that the notes shall not be void by reason of the prohibition. In the same volume, p. 177, the case of The Commonwealth *v.* Pittsburg decides that municipal corporations may perform portions of their business through committees. See also Painter *v.* Pittsburg, 10 Wright 213. When a municipal corporation transacts business as a vender and distributor of water, the relation of her employees is that of servants to her, and the maxim *respondeat superior* applies to their acts and negligences in conducting this business. Surely it cannot stand in a higher relation to the business than the state herself when she forms business connections, and for the time being lays down her sovereignty : Wheeling Bridge Case, 13 Howard 560 ; Turnpike

Company *v.* Wallace, 8 Watts 316. The facts of the case, as clearly ascertained, the weight of authority, and the demands of justice, make it evident that the relation of the city to the Fairmount Waterworks renders her liable for the acts of her servants and employees in drawing off the water contrary to her duty to the state, and her contracts with the Navigation Company. The acts and declarations of her agents and officers in the course of their several employments, and duty of supervision and control, were parts of the *res gestæ*, and were evidence to the extent set forth in the bills of exception.

It now remains to consider the influence of an extraordinary drought upon the case. It is a clearly proved fact, and one fully established by the verdict, that the chief engineer of the waterworks and his subordinates drew off the water of the pool, to supply the reservoirs of the city, below the top level of the dam, and kept it drawn off so far below, that, from the 9th of August till the 7th of September 1869, the navigation of the pool was wholly impeded to the class of boats usually navigating the Schuylkill previous to that time. The plaintiff's boat was of this class, and drew, perhaps, half an inch less. Was this alleged wrong justified by an overruling necessity? Let it be conceded that an extraordinary drought, following the order of nature, is an act of God, the author of the laws of this order, and that in consequence some one must suffer without redress, upon the maxim *Actus Dei nemini facit injuriam ;* and let it be admitted, that, for the necessary use of man and his dependent creatures, the right to this element, as indispensable to life and health, is superior to the right of the navigator ; yet the inquiry remains, was there such a necessity in this instance, to take from the navigator his superior right to use the stream.

The injury, as shown by the evidence and established by the verdict, arose from the use of the Schuylkill by the city for water-*power*, and not merely for *consumption*. For every gallon of water supplied to the reservoirs thirteen and a half gallons were expended through the turbine wheels, for driving and lifting power; and when common water-wheels were used, the expenditure was twenty-seven gallons for power to every gallon pumped into the reservoirs for consumption. It is also in evidence, and an undoubted fact, that from time to time and for years the councils of the city have been warned by the chief engineer, in his reports, to take steps to protect the city in time of drought, by the use of steam-power, so as to economize the water of the Schuylkill for city use. This had not been effectually done, though steps had been taken in that direction, and in consequence of this negligence, the city has continued to use the water for power beyond the necessity of consumption, thus violating her duty in regard to the navigation by drawing unnecessarily upon the stream. The injury to the navigator is therefore

21 P. F. Smith—11

the result of negligence on the part of, the city, concurring, if you choose, with the providential act. But, in deciding upon the question of illegality in drawing off the water from the navigation, we are carried beyond its use for *power*, to inquire into the character of the *consumption* claimed as an overruling necessity.

We have already seen that the city is a large vender of water, from which she is deriving revenue, for all the purposes of the arts, manufacturing, business and pleasure. These uses are not domestic, that is such as are for the preservation of the life and health of the population and their creatures, but are simply utilitarian or business uses, and far exceed those needed for domestic purposes. And even as to those termed domestic, a distinction must be noted between the use proper and that which is lavishly expended in pavement washing, baths, &c. It is perfectly obvious, therefore, that the city drew off water not only for driving and lifting power, but for a consumption far beyond any imperious necessity, and for purposes wholly subordinate to the right of navigation. She chose to prefer the pecuniary interest of her citizens, and doing an injury thereby, she must make compensation to the injured parties. I mean not by these remarks to draw any comparison between the importance of the use of the water for the great purposes of industry, wealth and cleanliness of a city so populous as Philadelphia, and the use of it for navigation during a few days of drought. The question for us is that of legal right, not comparative weight. Such important interests as those of the city are likely to lead to the substitution of might for right, yet they are not of that imperious necessity which justifies might, and changes wrong into right. Administrators of the law, we cannot bend or break the law before a large interest, more than we can before one that is small. The doctrine of imperious necessity is not in this case.

The influence of the drought bears upon another question raised in the defendant's sixteenth point, requiring the court to charge that though the city had no right to reduce the water below the comb of the dam, yet, if the plaintiff's boat could not have navigated Fairmount pool without a breast of water flowing over the dam, then the act of the city did no damage to the plaintiff, and he could not recover. The boat of the plaintiff was of the ordinary class capable of navigating the pools in ordinary low water. The court, therefore, properly answered the point by saying that, whether the city was justified in drawing off the water to the extent of reducing it to the level of the surface of the dam depends upon this, viz.: whether such a use of it impeded or interrupted navigation; and this was submitted as a question of fact for the jury, whose finding establishes that the drawing off the water at the time of the drought did impede the navigation. The reason given by Judge Thayer is conclusive, that by the 15th section of the charter the company could not sell or grant any water-power

[City of Philadelphia *v.* Gilmartin.]

which would have the effect of impeding or interrupting the navigation. The contract of 1824 granting the whole water-power down to the top level of the dam was, therefore, subject to a proviso, which the law itself imports into that contract, to wit, that thereby the navigation should not be impaired. The correctness of the verdict finds support in the fact that, when the city ceased to draw off the water and the water rose, on the 7th of September and afterwards, the navigation was resumed, though the drought continued, and the city herself was benefited by the increased power thus gained.

When the current of the stream ceases to flow, except in a thin thread, by reason of the drought, the water in the pool approaches closely to a horizontal plane, and loses the height at the head of the pool caused by the ordinary current when flowing. A current descending upon an inclined plane to the dam gives an increased height of water at the head of the pool. If the pool were three miles long, and the average fall of an ordinary current were two inches to the mile, the height of the water at the head of the inclined plane would be six inches above the horizontal level. A loss of this height at the head of the pool by reason of extraordinary drought would stop navigation to those boats which before had drawn the full depth of the pool. It is evident, therefore, that in such a season of drought, the top level of the dam does not measure the height of the water necessary for the navigation. The superior right of the navigator under the law of the state entitles him, therefore, to have all the diminished flow of the stream drawn away by the city, to be restored to him, instead of its being retained by her. If there be water left to float his boat he is entitled to it; and that there was is established by the restoration of the stream, on and after the 7th of September, when heads of water were permitted to accumulate.

All other questions not noticed, are considered as ruled by the former decision; and finding no error in the record, the judgment is affirmed.

SHARSWOOD, J., dissented.